**In re S.E. NICHOLS INC., Debtor.**

**Bankruptcy No. 90B–12450 (HCB).**

United States Bankruptcy Court,
S.D. New York.

Oct. 25, 1990.

Angel & Frankel, P.C. by Ira Able, New York City, for debtor.

Daley & Pollack by M. Theresa Daley, New York City, for 1710 Broadway, Inc.

### DECISION AND ORDER

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

S.E. Nichols Inc., the debtor and debtor in possession herein (the "Debtor" or "SEN"), seeks an order pursuant to section 365(a) of chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Code"), authorizing the rejection of an unexpired lease for premises located on the fourth floor 275 Seventh Avenue, New York, New York (the "Fourth Floor"). 1710 Broadway, Inc., the landlord for the premises (the "Landlord"), opposes rejection on the ground that the lease for the Fourth Floor is an integral and non-severable part of a larger, unitary lease which includes not only the Fourth Floor but rental space on the second and third floors of the same building as well.

### I

SEN filed its petition for reorganization on August 2, 1990. It operates a chain of deep discount drug and general merchandise stores. By order to show cause dated September 28, 1990, SEN sought a hearing to consider its application to reject an unexpired lease for the Fourth Floor. A hearing was held on October 17, 1990.

### A

Prior to bankruptcy, SEN entered into a lease agreement dated May 12, 1983 (the "1983 Agreement") with Union Sanitorium Associates, Inc., the Landlord's predecessor in interest, to rent office space located on the second and third floors of 275 Seventh Avenue (the "Second and Third Floors"). The parties agreed to a ten year term, plus one five year renewal option, at an annual rental rate of $288,000 for the period between February 1, 1984 to January 31, 1989 and $336,000 for the period between February 1, 1989 to January 31, 1994.

On September 1, 1986, Union agreed to lease the Fourth Floor to SEN (the "1986 Agreement"). The document memorializing this agreement is entitled "First Amendment to Agreement of Lease." The 1986 Agreement amended the 1983 Agreement to add 11,000 square feet located on the Fourth Floor, commencing October 1, 1986. The annual rate for the period between January 1, 1987 to January 31, 1989 was changed to $442,000 and for the period between February 1, 1989 to January 31, 1994 was changed to $501,000. The lease for all three floors expires on January 31, 1994.

Various provisions of the 1986 Agreement refer to or incorporate terms from the 1983 Agreement. For example, the parties state in the 1986 Agreement that "Landlord and Tenant now desire to incorporate additional space which is located on the [Fourth Floor] into premises demised under the [1983 Agreement] upon the terms and conditions contained herein." Paragraph 3 of the 1986 Agreement provides that "the word 'premises' each and every time it appears in the Lease shall be deemed to include the [Fourth Floor] in addition to the [Second and Third Floors]. All other terms defined in the [1983 Agreement] are, as applicable, incorporated herein by reference and made a part hereof."

The 1986 Agreement altered the additional rent to be paid by SEN for its portion of the Landlord's contract price for a sprinkler supervisory system. Under the 1983 Agreement, SEN would pay, as additional rent, 9.6% of the cost to the Landlord for the sprinkler supervisory system, not to exceed $200, *see* 1983 Agreement ¶ 29; by the 1986 Agreement, SEN must pay 11.8% of the Landlord's cost, for a sum not to exceed $240, *see* 1986 Agreement ¶¶ 7, 8. Similarly, the 1986 Agreement increased the additional rent due from increases in real estate taxes from 9.6% to 11.8%. *Id.* at ¶ 6(b).

Furthermore, the 1986 Agreement added a new Article (No. 59). Article 59 has no counterpart in the 1983 Agreement and provides that SEN shall pay as additional rent a percentage of the Landlord's increased labor costs concerning the operation and maintenance of the building. *Id.* at 9. The additional rate is arrived at by multiplying SEN's "approximate area" by the number of cents of the Landlord's excess labor rates as defined elsewhere. *Id.* at ¶ 9(C).

### B

In arguing that it may reject the 1986 Agreement under section 365(a) of the Code, SEN contends that the two agreements represent two separate leases notwithstanding the form of the documents reflecting those agreements. SEN submits that the two agreements are each a separate, distinct, and fully integrated contract. SEN dismisses the 1986 Agreement's referral to and incorporation of terms from the 1983 Agreement as mere convenience. Finally, SEN points to various factors, some outside of the agreements themselves, as evidencing the parties' intentions to create two leases: 1) the negotiations surrounding the 1986 Agreement were "different in kind" from those regarding the 1983 Agreement, *see* Debtor's Memorandum of Law in Support of its Motion 7; 2) considerable time elapsed between the two agreements; 3) the "goals" of the 1986 Agreement were "entirely different" from those of the 1983 Agreement, *see id.*; 4) separate consideration supported each agreement;

5) each agreement concerns different real property; 6) the rental rates set forth for the Fourth Floor are unrelated to those for the Second and Third Floors; and 7) the parties' intentions were to create separate and distinct contracts. *Id.*

The Landlord counters that the agreements are one lease and therefore incapable of individual assumption or rejection under the Code. The Landlord submits that the writings are completely integrated and that resort to parol evidence cannot be allowed absent ambiguity in the documentation, Landlord's Memorandum of Law in Opposition to Debtor's Motion 3. In addition, the Landlord contends that by calling the 1986 Agreement an "amendment", the parties' belied their intention to modify the 1983 Agreement rather than create a new and independent contract. *Id.* at 4. The Landlord cites various provisions in the agreements it believes evidence the interdependence and unity of the two documents, including: 1) the merger clause in the document, 1986 Agreement at ¶ 13; 2) the clause incorporating terms from the 1983 Agreement into the 1986 Agreement, *id.* at ¶ 3; 3) the clause providing that except as modified by the 1986 Agreement, all the covenants and conditions of the lease shall remain in full force and effect, *id.* at ¶ 18. Landlord's Motion at 5.

Two issues need resolution here. First, whether parol evidence is necessary and appropriate to a determination of the dispute. Second, whether, under New York state law, the 1986 Agreement is a modification of the earlier agreement or a separate lease.

### II

■■■ Section 365(a) provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a) (1989). It is well-settled that a debtor cannot assume part of an unexpired lease while rejecting another part; the debtor must assume the lease *in toto* with both the benefits and burdens intact. *See Richmond Leasing Co. v. Cap-*

*ital Bank,* 762 F.2d 1303, 1311, 12 Collier Bankr.Cas.2d 1202, Bankr.L.Rep. ¶ 70,593 (5th Cir.1985); *Lee v. Schweiker,* 739 F.2d 870, 876, 11 Collier Bankr.Cas.2d 834 Bankr.L.Rep. ¶ 69,914 (3d Cir.1984); *In re Clavis Smith Building, Inc.,* 112 B.R. 768, 770, 20 Bankr.Ct.Dec. 559, Bankr.L.Rep. ¶ 73,307 (Bankr.E.D.Va.1990); *In re City Stores Co.,* 21 B.R. 809, 812 (Bankr.S.D.N.Y.1982). For purposes of section 365, interpretation of the legal status of lease agreements is governed by state law. *See In re W.A.S. Food Serv. Corp.,* 49 B.R. 969, 971, 12 Collier Bankr.Cas.2d 1371, Bankr.L.Rep. ¶ 70,644 (Bankr.S.D.N.Y. 1985). *See also In re Petroleum Prods., Inc.,* 72 B.R. 739, 742 (Bankr.D.Kan.1987); *In re Mesa Refining Inc.,* 52 B.R. 359, 362 (Bankr.D.Colo.1985).

## A

■ When parties to a contract reduce their agreement to a writing and the provisions of the writing clearly delineate the parties' legal obligations to one another without any ambiguity as to the subject matter, terms, and conditions thereof, the parol evidence rule bars admissibility to prior or contemporaneous evidence which tends to prove a contract different from the one evidenced in the writing. *See, e.g., Loch v. Sheldrake Assocs. v. Evans,* 306 N.Y. 297, 118 N.E.2d 444, 447 (1954); 58 N.Y.Jur.2d *Evidence and Witnesses* § 555 (1986). Although parol evidence is inadmissible to vary or contradict the terms of a written contract, it is properly admitted for the purpose of identifying the subject matter of the agreement. *See Mullen v. Washburn,* 224 N.Y. 413, 121 N.E. 59, 60 (1918); *Curcio v. Lounsbury,* 64 N.Y.S.2d 128, 129 (Westchester Co. 1946); 58 N.Y. Jur.2d *Evidence and Witnesses* § 596 (1986).

## B

■ Under New York law,[1] an existing contract may be modified by a subsequent agreement and proved by circumstantial evidence. *Martin v. Peyton,* 246 N.Y. 213, 218, 158 N.E. 77, 78 (1927). The effect of a modified contract is the production of one new contract which consists not only of the terms subsequently agreed upon, but as many of the terms of the original contract as have not been abrogated by the modification. *Stone v. Stone,* 78 Misc.2d 788, 358 N.Y.S.2d 641, 642 (Sup.Ct. Ont.Co.1974). Where a lease is subsequently modified, the lease and the modification must be taken together and construed as one contract in order to effect the intention of the parties. *See* 74 N.Y.Jur.2d *Landlord and Tenant* § 59 (1988).

■ In determining whether a new agreement constitutes a new lease or the modification of an existing lease, substance, rather than form, controls. *Winter v. Ajax Auto Serv. Co.,* 81 N.Y.S.2d 17, 18 (Sup.Ct.N.Y.Co.1948). Typically, legitimate lease modifications will include provisions reducing rent, *see, e.g., 86 Near Second Avenue Corp. v. Fennekohl,* 186 Misc. 726, 61 N.Y.S.2d 167, 173 (N.Y.C.Civ.Ct.1946) (citing cases), or surrendering unexpired terms, *see, e.g., Douglaston Realty Co. v. Hess,* 124 A.D. 508, 108 N.Y.S. 1036 (2d Dep't 1908). *See generally* 74 N.Y.Jur.2d *Landlord and Tenant* § 59 (1988).

■ In *Winter,* the parties agreed to extend the term of the lease and provided for a higher rental rate for the additional term. 81 N.Y.S.2d at 18. Although section 8534 of New York's Unconsolidated Laws, N.Y. Unconsol. Laws § 8534 (McKinney 1979) (expired 1963), provided that the rental rate provisions of any lease in force on or before March 1, 1943 shall determine the amounts payable under the lease unless properly modified by the parties, the plaintiff sought to enforce rental provisions contained in a subsequent agreement. The court dismissed the complaint, holding the second agreement to be a new lease and not a modification of the original lease. *Id.* In finding the second agreement a new lease, the court reasoned:

---

1. Both parties agree that New York law controls Landlord's Memorandum 2; Debtor's Memorandum 2.

[The second agreement] did not change any of the terms or provisions of the existing lease for the period prior to its expiration date. It had no different legal effect than it would have had if it had been entered into at the expiration date of the existing lease instead of some time previous thereto. The fact that the parties to the [second agreement] referred to it as an extension and modification is not controlling, nor is it material that the terms, covenants and conditions of the existing lease, other than the term and the rental, were incorporated by reference in the [second agreement] instead of being set out at length therein. It is the substance rather than the form that is important.

*Id.* Absent changes in the original agreement's terms and provisions that go beyond the inclusion of additional subject matter, it appears that New York law will deem a subsequent agreement a separate contract.

Further support for this proposition exists in *Application of Diesel Construction Co.*, 36 Misc.2d 1091, 234 N.Y.S.2d 349 (Sup.Ct.N.Y.Co.1962), where the petitioner sought an order staying certain arbitration proceedings. Two agreements were at issue: a second agreement, between the petitioner and respondent, stated that the parties wished to "amend" an earlier agreement, between the petitioner's subcontractor and the respondent. The second agreement incorporated terms and provisions from the earlier agreement into the second and contained an arbitration clause subjecting disputes arising out of the contract to arbitration. 234 N.Y.S.2d at 350. The court found, however, that the "amendment" was a separate contract and consequently the arbitration clause applied only to disputes arising out of and concerning the second agreement. *Id.* By labelling the second agreement an "amendment", the parties indicated only an intent not to extinguish the earlier agreement. *Id.*

From these cases, the principle can be distilled that a subsequent agreement, in order to be a modification and deemed part of a single contract, must do more than label itself an amendment or incorporate terms and provisions from the earlier

agreement: it must alter original terms and provisions in the first agreement. *See Federal Deposit Insurance Corp. v. Herald Square Fabrics Corp.*, 81 A.D.2d 168, 439 N.Y.S.2d 944, 953 (2d Dep't 1981) (dealer agreement not modified by subsequent writing where nothing in second document indicated that any of the dealer agreement's provisions were altered or intended to be altered).

### III

Given the applicable New York law on this issue, the interpretation of the two agreements must focus upon the 1986 Agreement's effect on the 1983 Agreement; specifically, whether any original provision of the earlier agreement was altered, changed, deleted, or cancelled by the subsequent agreement. If the original agreement was altered, then New York law mandates characterization of the two agreements as one contract incapable of separate assumption and rejection under the Code.

As the cases and discussion in section II–B *supra* indicate, the mere addition of subject matter is insufficient. In this case that standard dictates that the two agreements cannot be deemed one contract merely because the number of square feet was changed to reflect the additional space on the Fourth Floor or the word "premises" in the 1983 Agreement was re-defined to include the Fourth Floor. Likewise, the parties' use of the word "amendment" to describe the 1986 Agreement is of no moment. Indeed, if "amendment" carries any weight, it indicates only that the parties desired not to rescind the 1983 Agreement but to preserve their obligations contained therein. *See Diesel Construction Co.*, 234 N.Y.S.2d at 350.

A cursory examination of the 1986 Agreement reveals provisions, *i.e.*, the additional rent provisions, which appear to change terms in the original lease agreement. On a closer inspection, however, these provisions setting additional rent for increases in real estate taxes, labor costs, and the sprinkler supervisory system do

not appear to alter the original rates set for the occupation and use of the Second and Third Floors, but rather to reflect only the Fourth Floor's share of the Landlord's costs.

Looking at the provisions for the additional rent based on increases in real estate taxes and the sprinkler supervisory system, we see that both rates jump from 9.6% to 11.8%. However, the specific language used in the two provisions varies significantly. The 1986 Agreement states that "the percentage '9.6%'" in the 1983 Agreement denoting the Second and Third Floors' proportionate share of any increase costs in the sprinkler supervisory system "shall be deleted and the percentage '11.8%' shall be substituted therefor." 1986 Agreement ¶ 7. In telling contrast, as to the additional rent from real estate tax increases, the 1986 Agreement states that SEN "shall pay to Landlord an additional rent with respect to the [Fourth Floor] based upon increases in real estate taxes payable by Landlord" and the "'[p]roportion of real estate taxes' payable by [SEN] ... shall be 2.2%." *Id.* at ¶ 6. Since 2.2 percent reflects the change effected by the 1986 Agreement in amount due as additional rent as a result of increased costs in either the sprinkler supervisory system or real estate taxes and the language of the real estate tax provision itself demonstrates that the 2.2 percent amount constitutes only the pro rata share for the Fourth Floor, it is clear that no provision in the original 1983 Agreement is changed. For the space let on the Second and Third Floors, the additional rent owed by SEN remains 9.6% of the Landlord's increased costs.

Similarly, Article 59 of the 1986 Agreement does not expand or alter SEN's obligations under the lease for the Second and Third Floors. The formula established in Article 59 for calculating the additional rent demonstrates that Article 59's obligations accrue only by virtue of the space

let on the Fourth Floor. SEN will owe, as additional rent, the product of its "approximate area" times the number of cents of the Landlord's increased labor costs as defined elsewhere. SEN's "approximate area" is defined as 11,000 square feet, *see id.* at ¶ 9(B)(4), an amount equal to the space on the Fourth Floor. So, while the 1986 Agreement added Article 59 to the 1983 Agreement which on its face covers the Second and Third Floors, Article 59 by its terms applies only to the square footage located on the Fourth Floor.

Were it not for a troublesome rental rate provision in the 1986 Agreement, it would be clear from the documents themselves that the parties did not change any of the terms of the earlier agreement and therefore did not effect a modification of the 1983 Agreement under New York law. It is not clear from the 1986 Agreement, however, that the parties did not alter the base rental rate applicable to the Second and Third Floors. The 1986 Agreement increased the annual rental rate due between January 1, 1987 and January 31, 1989 from $288,000 to $442,000. It is not certain that the difference of $154,000 reflects only the increase in rented space. Indeed, if all the floors were equal in size, and we suspect they are not,[2] the increase in rent should equal $144,000 (288,000 divided by two). The additional $10,000 may reflect an adjustment to the base rental rate for the Second and Third Floors. On the other hand, it may simply reflect the discrepancy between the commencement date of the Fourth Floor lease and the date when the amended rental rate became effective. *Compare* 1986 Agreement ¶ 2 ("[t]he term of the Lease for the [Fourth Floor] shall commence on October 1, 1986") *with id.* at ¶ 5 ("[e]ffective January 1, 1987, the annual rental rate set forth on the first page of the Lease" shall be $442,000). Similarly, the 1986 Agreement changed the rent for the period between February 1, 1989 to January 31, 1994 from $336,000 to $501,-

---

**2.** While stating that the entire Second and Third Floors are being leased to SEN, the original lease does not specify the square footage leased on the Second and Third Floors. However, looking at the additional rent provisions for increased real estate taxes and sprinkler maintenance costs, the Second and Third Floors' pro rata share for those increases is 9.6%, or 4.8% per floor. As evidenced by the 1986 Agreement, the Fourth Floor's pro rata share is only 2.2%.

000. Again, it is not clear that the difference of $165,000 represents solely the rent due for the Fourth Floor. In sum, we cannot conclusively determine that the rental rate for the Second and Third Floors was not renegotiated and altered by the 1986 Agreement.

B

 Given the ambiguity concerning the issue of whether the 1986 Agreement may have altered the base rental rate for the Second and Third Floors, the Court cannot decide this issue solely on the basis of the parties' writings and must grant SEN's request to present parol evidence on the subject. The parol evidence rule is not a bar in this case because the parol evidence on the relevant issue will not alter or contradict any explicit provision in the agreements, but rather it will explain the scope of terms and provisions in the 1986 Agreement. Parol evidence is necessary here to supplement the parties' writings regarding the precise subject matter and scope of the 1986 Agreement. Specifically, in order to ascertain whether the 1986 Agreement is a separate lease, the Court needs parol evidence showing provisions, if any, within the 1986 Agreement which change or alter original terms of the 1983 Agreement.

In sum, we are mindful that the parol evidence rule protects the parties' bargain as it is reflected in their writing; however, parol evidence is not sought here to undo or alter the parties' bargain, but simply to determine its scope. While the parties negotiated and agreed to lease the Fourth Floor and chose to memorialize that agreement in the form of an amendment to the original lease, it is unlikely that the parties' bargain included decisions regarding the status of the agreements as one lease or two. Furthermore, it is not clear that the amendment altered the parties' rights and obligations as to the Second and Third Floors or that the terms and provisions of the 1983 Agreement do not still govern, without reference to the 1986 Agreement, the rental of the Second and Third Floors.

For the foregoing reasons, SEN's motion seeking approval to reject the lease, or part of the lease, of the Fourth Floor cannot be granted at this time. SEN's request to present parol evidence is granted and the Landlord's objection to presentation of parol evidence is denied. The parties are directed to schedule an evidentiary hearing with chambers.

It is SO ORDERED.