JOINER, District Judge.
 

 This case arises out of the Chapter 11 bankruptcy of Covington Landing Limited Partnership (the “partnership”), the entity that operates vessels on the riverfront in Covington, Kentucky, which house restaurants, bars and retail shops. The premises on which these facilities are located have been leased from the City of Covington since 1988. Due to the sale of one of the two original vessels operated by the partnership, the bankruptcy court modified the lease between the City and the partnership. The City appeals, contending that it did not consent to the bankruptcy court’s ability to modify the lease, and that, absent its consent, the bankruptcy court lacked the power to order the modifications. The City further contends
 
 *1223
 
 that it did not agree to the specific modifications made by the court. We affirm.
 

 I.
 

 Covington Landing is a limited partnership with one general partner. Prior to the bankruptcy, the partnership owned and operated two adjacent barge vessels anchored in the Ohio River. One vessel, the Wharf, consisted of multiple levels of restaurants and retail enterprises operated by third parties under lease arrangements with the partnership. The other vessel, the Spirit of America, was a replica of a river steamboat and contained a large restaurant with seating for 550 patrons. The entire complex is located on riverfront property leased by the City of Covington to the partnership in 1988, pursuant to what the parties call the Mooring lease.
 

 The development of the riverfront complex was expensive for both the City and the partnership. The City built docking and adjoining parking facilities at a cost of several million dollars, and the partnership borrowed over $12 million to create the complex. The facilities were in operation for several years, and the partnership found that it generated enough income to meet operational expenses, but insufficient income to service its debts.
 

 The partnership filed a voluntary Chapter 11 petition in October 1992, and began investigating the possibility of selling one of the two vessels. The Sahara Resorts offered to purchase the Spirit for $7.8 million, planning to operate the vessel as a gambling casino in Missouri. The proposed sale presented two hurdles, however. First, it was necessary for the bankruptcy court to approve the sale because it was outside the ordinary course of business. Second, sale of the Spirit affected the partnership’s rights to the riverfront property in question, because the Mooring lease obligated the partnership to operate “Floating Restaurant Facility(ies) with not less than 550 seats.” On April 12, 1993, the bankruptcy court held a hearing on the proposed sale, at which both secured and unsecured creditors voiced their support. The ensuing colloquy between the court and the attorneys representing the City, the partnership and the limited partners committee reflected that the parties were chiefly concerned with whether the sale would be considered a breach of the Mooring lease and whether the partnership would retain rights to the property after the sale of the Spirit.
 

 The partnership explained that, while the sale proceeds would permit it to formulate and carry out its plan of reorganization, it was essential that the City not declare the sale to be a material breach of the lease such that the partnership would lose its rights to operate the Wharf facility. The partnership also was concerned, as was the partners committee, regarding the future rights to the space to be vacated by the Spirit. The partners committee reported the City’s agreement to allow the partnership eighteen months to utilize the space vacated by the Spirit, provided, however, that if the City received a bid from.another company, the partnership would have a right of first refusal for a period of thirty days. The partners committee questioned whether the partnership could meet these deadlines.
 

 The City approved the sale, both as lessor and as a creditor, stating that it would not view the sale as a breach of the Mooring lease, and that it did not want the partnership to lose its rights to the Wharf area. The City acknowledged the uncertainties resulting from the sale of the Spirit and the type of facility that would be brought in to replace it, and committed to negotiate in good faith with the partnership regarding all of these issues.
 

 The parties informed the court that they were negotiating an agreed order, the initial draft of which was prepared by the attorney for the partnership, to address the effect of the Spirit’s sale on the Mooring lease. The hearing was adjourned for two hours to permit the parties to negotiate the terms of the draft more fully, resulting in the deletion and modification of many of the original terms of the draft. As negotiated, the agreed order states that the sale of the Spirit does not constitute a breach “such as will result in the Debtor losing its rights under the Mooring Lease with regard to the Wharf and its operation.” The agreed order establishes the base rental payments for the Wharf area alone at $3000 per month, an increase over
 
 *1224
 
 the Mooring lease rent applicable to the Wharf. The parties’ dispute in this case centers on paragraph three of the agreed order:
 

 The City and the Debtor have agreed that they will negotiate, in good faith, to reach by June 30, 1993, an amended and restated Mooring Lease modified to reflect the sale and removal of the [Spirit]. Any amended and restated Mooring Lease shall be subject to approval by the Court. In the event no agreement is reached by June 30, 1993 as to an amended and restated Mooring Lease, the City and Debtor reserve all rights to such appropriate relief from the Court with regard to the ongoing terms of the Mooring Lease relative to the space formerly occupied by the [Spirit] and its relationship to the space leased by the Debtor for the Wharf.
 

 After the amendments to the agreed order were set forth on the record, the partners committee again expressed its concern that the order clearly state that the sale not be considered a breach of the lease. “The City ... takes the position that ... if we negotiate with you and you can’t come up with a sufficient modification, we want to reserve all of our rights. Well, I think that goes to negotiating in good faith, Your Honor, but I don’t certainly want them to be able to claim that we have a breach by selling that boat right now.” The City replied:
 

 The City’s position is that we didn’t want to stand in the way of the sale of the [Spirit] this morning and did not want to interfere with the rights of the partnership to continue to operate the wharf operation. However, we are not in agreement with that very valuable space to remain open forever and Mr. Williams’ [another City attorney] comment this morning that we didn’t object to the sale was in the context that
 
 we would give them 18 months to find something else for that boat’s space. That is still our position.
 
 We believe the language as drafted is acceptable but we are going to negotiate to try to give them a reasonable time but we are not going to give them forever.
 

 (Emphasis added.)
 

 In the weeks following entry of the agreed order, the parties negotiated amendments to the Mooring lease but could not reach an agreement. The City then filed a motion requesting the court to require the-partnership to assume or reject the Mooring lease, taking the position that the partnership was entitled to a lease for the Wharf facilities only, and that the partnership had no rights to the river frontage vacated by the Spirit. The bankruptcy court denied the City’s motion in October 1993. In determining whether the partnership retained any rights to occupy the space vacated by the Spirit, the bankruptcy court stated:
 

 [T]he Debtor should be entitled to rely upon not only the specific language of the Agreed Order but the remarks of counsel for the City made upon the record in open court. Those remarks included the City’s acquiescence to a period of 18 months for the Debtor “to find something else for the boat’s space.” Clearly the Debtor relied upon these and other statements in securing this Court’s permission to sell the Spirit and they became part of the entire transaction. The City is bound by the terms it agreed to the same as the Debtor.
 

 The bankruptcy court held that the partnership was entitled to eighteen months from April 12, 1988, to make use of the vacant space.
 

 After an evidentiary hearing to determine appropriate rental terms, the court divided the Mooring lease into two separate leases, one pertaining to the Wharf area, and the other pertaining to the area formerly occupied by the Spirit. The Spirit lease has a use provision similar to that in the Mooring lease, which obligates the partnership to use the premises “for the purpose of docking a floating restaurant facility with not less than 550 seats and such purposes related, thereto, or such other use as may be approved by the City in the exercise of its reasonable discretion[.]” The bankruptcy court modified the rent schedule, increasing the base rentals for the first ten years under the lease, decreasing it for the ensuing years, but increasing the rent based on gross sales. The court approved both leases in its January 1994 order confirming the Chapter 11 plan, expressly finding, pursuant to 11 U.S.C.
 
 *1225
 
 § 365(b)(1), that the partnership had cured or provided adequate assurances that it would cure all defaults under the Mooring lease; the proposed rental payments under the two leases would compensate the City for any actual pecuniary losses; and the anticipated rent revenue from the Wharf and the anticipated revenues and/or development right limitations set forth in the Spirit lease gave the City adequate assurance of future performance under both leases. The bankruptcy court thus ordered the parties to execute both leases. The parties subsequently agreed to an order adding a paragraph to the Spirit lease (but not the Wharf lease) which stated that the City executed the Spirit lease while reserving its right to appeal. The order further provided that neither party would seek a stay of the confirmation order so that the provisions of the order pertaining to the Spirit lease would remain effective until a decision was rendered on the City’s appeal.
 

 The City appealed to the district court while the partnership continued its efforts to find a replacement for the Spirit by the bankruptcy court’s deadline. The City, before the district court, contended that the bankruptcy court lacked the power under 11 U.S.C. § 365 to redraft the lease as it did without the City’s consent. The district court held that the agreed order was ambiguous, and that the bankruptcy court was justified in looking to extrinsic evidence to ascertain its meaning, namely, the remarks of counsel at the April hearing. The district court held that the bankruptcy court properly construed the order in light of this extrinsic evidence when it found that the partnership had eighteen months to find a replacement for the Spirit, and that the parties agreed that the court would supply the terms of the amended lease if they could not reach an agreement themselves. The district court held that the bankruptcy court’s findings were not clearly erroneous, and that its construction of the April order was the most logical construction on the record before it.
 

 II.
 

 As a preliminary matter, the partnership claims that the City is equitably es-topped from pursuing this appeal and attempting to recover its possessory rights to the space formerly occupied by the Spirit, in light of the City’s failure to seek a stay of the confirmation order pending appeal. This argument was not advanced before the district court. The partnership informs this court, without record support, that in the months following the confirmation of the plan of reorganization, it leased a replacement vessel and spent over $600,000 to rehabilitate the vessel and secure it to the existing Wharf. The partnership also represents that it secured tenants for the replacement vessel, and that these tenants have incurred significant start-up expenses for their operations. The partnership states that it embarked on these arrangements in reliance on the bankruptcy court’s confirmation of the plan and the City’s agreement not to seek a stay pending appeal. For its part, the City states that the partnership proceeded with further development at its own peril, as evidenced by its agreement that the City need not seek a stay pending appeal. The City further contends that all third parties that dealt with the partnership were on notice of the bankruptcy and pending appeal, and that some of the third parties are entities related to the partnership.
 

 A growing number of eases outside this circuit recognize that “a plan of reorganization, once implemented, should be disturbed only for compelling reasons.”
 
 In re UNR Indus.,
 
 20 F.3d 766, 769 (7th Cir.) (collecting eases),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 509, 130 L.Ed.2d 416 (1994). In determining whether an appeal from a Chapter 11 confirmation order should go forward, the Seventh Circuit asks whether it is “prudent to upset the plan of reorganization at this late date.”
 
 Id.
 
 The Fifth Circuit makes this determination by examining three factors: (1) whether a stay has been obtained; (2) whether the plan has been “substantially consummated”; and (3) whether the relief requested would affect either the rights of parties not before the court or the success of the plan.
 
 Manges v. Seattle-First Nat’l Bank (In re Manges),
 
 29 F.3d 1034, 1039 (5th Cir.1994),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 1105, 130 L.Ed.2d 1071 (1995). The failure to seek a stay, however, is not necessarily fatal to the
 
 *1226
 
 appellant’s ability to proceed.
 
 UNR Indus.,
 
 20 F.3d at 769-70;
 
 Manges,
 
 29 F.3d at 1040.
 

 [Requesting a stay is not a mandatory step comparable to filing a timely notice of appeal. The significance of an application for a stay lies in the opportunity it affords to hold things in stasis, to prevent reliance on the plan of reorganization while the appeal proceeds. A stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization.
 
 And it is the reliance interests engendered by the plan, coupled with the difficulty of reversing the critical transactions, that counsels against attempts to unwind things on appeal.
 

 UNR Indus.,
 
 20 F.3d at 769-70 (emphasis added).
 

 The record in this case is inadequate to sustain the partnership’s equitable estoppel argument. The partnership provides no facts on which we can assess the ease or difficulty with which the space formerly occupied by the Spirit could be returned to the City. More troubling, however, is the fact that the partnership, knowing of the City’s appeal to the district court, agreed that the City not seek a stay pending appeal, thus permitting the partnership to continue with its efforts to occupy the space vacated by the Spirit. Having entered into this agreement, the partnership can hardly claim that it relied on the finality of the confirmed plan, and that it is equitably entitled to a ruling prohibiting the City’s appeal from going forward.
 
 Cf. Michel v. Federated Dep’t Stores (In re Federated Dep’t Stores),
 
 44 F.3d 1310, 1317 (6th Cir.1995) (trustee’s appeal of order under 11 U.S.C. § 327 approving debtor’s retention of financial adviser not barred by trustee’s failure to seek stay of order pending appeal; financial adviser knew trustee objected to appointment, and that appointment would be reviewed de novo on appeal). Accordingly, we turn to the merits of the parties’ dispute.
 

 III.
 

 In an appeal from a district court’s review of a decision by a bankruptcy court, we independently review the bankruptcy court’s decision, its findings of fact for clear error, and its conclusions of law de novo.
 
 Trident Assocs. Ltd. Partnership v. Metropolitan Life Ins. Co. (In re Trident Assocs. Ltd. Partnership),
 
 52 F.3d 127, 130 (6th Cir.),
 
 cert. denied,
 
 — U.S. -, 116 S.Ct. 188, 133 L.Ed.2d 125 (1995).
 

 The City contends that this appeal presents first and foremost a legal question, whether the bankruptcy court had the power under 11 U.S.C. § 365 to modify the Mooring lease. Section 365 permits the trustee or the debtor in possession to assume or reject an executory contract or unexpired lease, with court approval. If, however, the debtor is in default, the debtor cannot assume the contract until he (A)'cures the default or provides adequate assurance that he will; (B) compensates the other party for pecuniary loss or provides adequate assurance that he will; and (C) provides adequate assurance of future performance on the contract. 11 U.S.C. § 365(b)(l)(A)(C). Section 365(e) provides that an unexpired lease or executory contract cannot be terminated because the debtor has filed a bankruptcy petition, is insolvent, or has had a trustee appointed for it, even if the lease or contract so permits.
 

 Section 365 is intended to provide a means whereby a debtor can force another party to an executory contract to continue to perform under the contract if (1) the debtor can provide adequate assurance that it, too, will continue to perform, and if (2) the debtor can cure any defaults in its past performance. The provision provides a means whereby a debtor can force others to continue to do business with it when the bankruptcy filing might otherwise make them reluctant to do so. The section thus serves the purpose of making the debtor’s rehabilitation more likely.
 

 Richmond Leasing Co. v. Capital Bank, N.A.,
 
 762 F.2d 1303, 1310 (5th Cir.1985). When the debtor assumes the lease or the contract under § 365, it must assume both the benefits and the burdens of the contract. Neither the debtor nor the bankruptcy court may excise material obligations owing to the non-debtor contracting party.
 
 Id.
 
 at 1311;
 
 In re Village Rathskeller, Inc.,
 
 147 B.R. 665, 671 (Bankr.S.D.N.Y.1992) (“[T]he agreement
 
 *1227
 
 becomes property of the estate in the same shape as it existed prior to bankruptcy, with all of its benefits and burdens.”);
 
 In re S.E. Nichols Inc.,
 
 120 B.R. 745, 747 (Bankr.S.D.N.Y.1990).
 

 Based upon these general principles, the City contends that the bankruptcy court had no power under § 365 to modify the Mooring lease, and, if the partnership intended to assume the Mooring lease, the court should have required the partnership to assume all of the burdens of that lease. Perhaps recognizing that the partnership’s legal obligation to assume all of the burdens of the Mooring lease was fundamentally altered by the City’s agreement to the sale of the Spirit, the City states that it merely agrded that the sale would not “in and of itself’ be a “technical default” under the lease. Based on this characterization of its consent, the City insists that the partnership could not assume the Mooring lease unless it cured all of the defaults under that lease (even if they resulted from the sale of the Spirit), e.g., the reduction in rental income, tax income and parking revenues. The City further contends that if the partnership could cure these defaults, the bankruptcy court then could have modified the Mooring lease to confer to the partnership continued rights to the Wharf space
 
 only,
 
 and that it overstepped the bounds of its authority when it granted the partnership rights to the Spirit space as well.
 

 We cannot agree that § 365 limits the partnership to assuming or rejecting the Mooring lease with all of its benefits and burdens intact. Section 365 does not speak to the situation in which the parties to the contract negotiate an amended contract. “[T]o the extent that the amended lease represents a true renegotiation of the obligations of [the parties] it falls entirely outside of § 365’s concern.... Nothing in the Code suggests that the debtor may not modify its contracts when all parties to the contract consent.”
 
 Richmond Leasing Co.,
 
 762 F.2d at 1311. The City agreed to the sale of the Spirit, agreed that the sale would not constitute a default, agreed that the partnership would retain rights to the Wharf space under a modified rental schedule, and agreed to future action with respect to the space vacated by the Spirit. These agreements fundamentally changed the parties’ leasehold relationship, putting this case outside strict application of § 365. The outcome of this case thus depends not solely on § 365, but on the legal effect of the agreements made by the parties in this particular ease, as reflected in the agreed order and the attorneys’ remarks at the April 12 hearing.
 

 An agreed order, like a consent decree, is in the nature of a contract, and the interpretation of its terms presents a question of contract interpretation. This court recently has clarified that the interpretation of a consent decree is question of law reviewed de novo.
 
 Huguley v. General Motor
 
 s
 
 Corp.,
 
 67 F.3d 129, 132 (6th Cir.1995). The lower court’s findings of fact are reviewed for clear error, but the legal import of those findings is assessed in light of the parties’ contractual agreement, a matter which is entitled to plenary review.
 
 Id.
 
 We review the bankruptcy court’s decision under these standards.
 

 The bankruptcy court implicitly found that the parties had delegated to it the power and duty to supply the terms of the lease pertaining to the space to be vacated by the Spirit if the parties’ negotiations did not result in an agreement. In contesting this proposition, the City relies on the phrase in paragraph three of the agreed order in which the parties “reserve all rights to such appropriate relief from the Court” if the parties could not agree on modified terms. The rights reserved, according to the City, are those to full performance by the partnership under the terms of the Mooring lease. The City denies that this language granted the bankruptcy court the power to redraft the leases. In making this argument, the City overlooks the fact that it agreed to continue its landlord-tenant relationship with the partnership, but under amended terms. Thus, a modification of the Mooring lease was essential, and the language in paragraph three cannot mean that the City remained entitled to full performance under the Mooring lease. Further, the City focuses on the “reserve all rights” language in isolation, ignoring that the “rights” reserved are
 
 “to such appropri
 
 
 *1228
 

 ate relief from the Court with regard to the ongoing terms of the Mooring Lease relative to the space formerly occupied by the [Spirit] and its relationship to the space leased by the [partnership] for the Wharf.”
 
 (Emphasis added.) In light of the necessity to amend the lease to effectuate the parties’ agreements, the most reasonable construction of this language is that the bankruptcy court was empowered to set the terms in the event the parties could not themselves reach a complete accord.
 

 The bankruptcy court expressly found that the City agreed to allow the partnership eighteen months in which to find a substitute use for the Spirit space. This finding is clearly supported in the record. Twice during the April 12 hearing counsel for the City represented to the court that the City adhered to the eighteen-month period. The issue raised by the partners committee concerned whether eighteen months was
 
 sufficient;
 
 the City never stated that it did not intend to allow the partnership
 
 at least
 
 eighteen months.
 
 [1]
 

 Finally, in approving the modified leases in its confirmation of the plan of reorganization, the bankruptcy court implicitly held that the City was entitled to the benefits of the Mooring lease that had not been waived by virtue of its consent to the sale of the Spirit. Consequently, the court analyzed the leases under § 365, expressly finding that the partnership had cured or provided adequate assurances that it would cure any defaults; that the rental payments under the modified leases compensated the City for actual pecuniary losses; and that the City was given adequate assurance of future performance under the modified leases. The City now argues before this court that the partnership’s defaults were not cured, and mentions as examples the partnership’s alleged defaults in its maintenance obligations, and collateral consequences of the removal of the Spirit, such as reduced parking and tax revenues. Argument is not a substitution for evidence, however, and we are provided with no evidence that the partnership defaulted in its maintenance obligations. Moreover, assuming without deciding that the collateral consequences of the sale of the Spirit constitute a default that the partnership was obligated to cure, the City presents no evidence contradicting the bankruptcy court’s finding that the partnership’s performance under the modified leases would compensate the City for actual pecuniary losses. Accordingly, we conclude that the bankruptcy court’s findings are not clearly erroneous. In sum, we conclude that the bankruptcy court did not exceed the powers delegated to it by the parties, that the terms of the modified leases are consistent with the agreement of the parties, and that the City obtained the benefits of the Mooring lease that were not waived by virtue of its consent to the sale of the Spirit.
 

 AFFIRMED.
 

 [1]
 

 . The City further objects to the use restrictions in the Spirit lease, contending that they allow the partnership "carte blanche” to develop the Spirit space in whatever manner it chooses to indulge. This allegation is belied by the restrictions in the Spirit lease, carefully incorporated by the bankruptcy court from the original Mooring lease.