# United States Court of Appeals

## For the First Circuit

Nos. 04-2298, 04-2530

LIBERTY MUTUAL INSURANCE COMPANY,

Plaintiff, Appellee,

v.

GREENWICH INSURANCE COMPANY,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert B. Collings, U.S. Magistrate Judge]

Before

Boudin, Chief Judge,

Torruella, Circuit Judge,

and Baldock,* Senior Circuit Judge.

Stephen R. Swofford with whom Lawrence R. Moelmann, Nancy G.
Lischer, Clifford E. Yuknis and Hinshaw & Culbertson LLP were on
consolidated brief for appellant.
Douglas R. Gooding with whom Gregg Shapiro, Paul E. Bonanno,
Kara M. Zaleskas and Choate, Hall & Stewart LLP were on
consolidated brief for appellee.

August 4, 2005

*Of the Tenth Circuit, sitting by designation.

**BOUDIN**, **Chief Judge**.   This commercial dispute, more complicated than difficult, concerns a claim made on a surety bond issued by one insurer to another.   The district court granted recovery on the bond in favor of the claimant, Liberty Mutual Insurance Company ("Liberty"), and against the issuer of the bond, Greenwich Insurance Company ("Greenwich"). Greenwich has appealed, and we now affirm.

The scene is easily set.   In December 1999, American Tissue, Inc. ("American Tissue"), a manufacturer now bankrupt, obtained from Liberty two insurance policies to cover workers' compensation that American Tissue might be forced to pay in the course of its ordinary operations.   The policies ("the 1999 policies") were to cover accidents occurring during the period December 11, 1999-January 1, 2001, and provided coverage for American Tissue for amounts that it might owe for such accidents over and above a deductible of $250,000 for each claim.

These policies  were "fronting policies," providing that Liberty would pay all claims in their entirety up front and that American would reimburse Liberty for any amount paid on the claim up to the deductible; payments over and above the deductible were to be borne by Liberty.   The policies also required American Tissue to pay premiums, but the total amount of the premiums was to be adjusted retrospectively based, among other things, on actual losses experienced by Liberty.   The policies thus provided some

-2-

protection for American Tissue but greater protection for injured workers.

During the year 2000, American Tissue encountered financial difficulties and failed to make required payments to Liberty. So, as a condition of renewing the policies, Liberty insisted that American Tissue obtain guarantees to secure American Tissue's present and future obligations to reimburse Liberty. On December 11, 2000, the two companies signed an agreement to this effect ("the agreement") and Liberty then renewed American Tissue's policies for the period January 1, 2001, to January 1, 2002 ("the 2001 policies").

The agreement, which is at the center of the dispute, said that its purpose was to secure all of American Tissue's obligations to Liberty arising out of the 1999 and 2001 policies, including both reimbursements and premiums, and provided that payments due must be paid within 20 days of Liberty's written demand. To secure these payments, American Tissue agreed to deliver both a surety bond and a letter of credit in favor of Liberty, substantially in the form of the bond and letter of credit attached to the agreement.

The agreement provided that the amounts of the required bond and letter of credit would be fixed by schedules prepared by Liberty; but it also provided that Liberty "at its sole discretion" could increase the amounts by providing American Tissue revised

-3-

schedules, whenever Liberty feared that the existing amounts so guaranteed were inadequate to cover American Tissue's existing obligations.

Initially, Liberty sought a surety bond of $1,777,500 and a letter of credit of $2,172,500; however, American Tissue was unable to immediately supply so large a letter of credit. Accordingly, Liberty agreed to a bond in the amount of $3.7 million and a $250,000 letter of credit, provided that American Tissue thereafter increase the letter to reach $2,172,500 by April 15, 2001. The collateral-amount schedule read:

> Letter of Credit $250,000 to be increased to $2,172,500 no later than 4/15/2001
>
> Surety Bond $3,700,000 may be decreased to $1,777,500 on receipt of Letter(s) of Credit totaling $2,172,500

In the final agreement, the deadline for supplementing the letter of credit was changed to June 1, 2001.

On January 24, 2001, American Tissue obtained the required $3.7 million surety bond from Greenwich. In the archaic form sometimes used for surety bonds, the bond read that it would be void if American Tissue carried out its obligations under its agreement with Liberty but "otherwise" American Tissue and Greenwich were each jointly and severally liable in the amount of the bond. Separately, American Tissue agreed to indemnify Greenwich for any payments that Greenwich had to make to Liberty under the bond.

-4-

Having obtained an initial letter of credit for $250,000 on February 12, 2001, American Tissue on May 16, 2001, obtained an additional letter of credit for $2,172,500. Not long after, American Tissue sent an e-mail to Marsh & McLennan requesting that the surety bond be reduced to $1,777,500 in accordance with the agreement.[1] Marsh & McLennan forwarded the request to Greenwich, which responded that the bond reduction "can be done by rider, but it must be acknowledged by the carrier"--apparently meaning that Liberty must be notified first.

In all events, there is no evidence that Liberty was itself notified, or that it consented to a bond reduction, or that the bond amount was in fact ever reduced.[2] Instead, during 2001 American Tissue began to miss payments to Liberty and, on July 13, 2001, Liberty issued a new schedule raising (without qualification) the required security to $2,422,500 in letters of credit (the value of the two existing letters) and $3.7 million for the surety bond. Thereafter, to satisfy some of American Tissue's debt, Liberty drew down almost in full both existing letters of credit.

---

[1]The writer of the original e-mail may have assumed that Marsh & McLennan was Liberty's agent; this Liberty disputes, suggesting that Marsh & McLennan was acting as broker for American Tissue.

[2]In the law suit, the district court did not permit discovery about what happened, but Greenwich--which presumably would know if it reduced the bond--does not claim the denial of discovery on this issue to be error.

On August 17, 2001, and again on September 7, Liberty notified American Tissue that the latter was in default under the agreement on account of continued non-payments. On September 10, 2001, American Tissue filed for bankruptcy in Delaware. On October 9, Liberty wrote to Greenwich, claiming that the bankruptcy constituted a default under the agreement and bond, making Greenwich liable for the full amount of the bond ($3.7 million), which Liberty now asserts is less than the estimated loss that Liberty is going to suffer from American Tissue's default.

On Greenwich's refusal to pay, Liberty on January 29, 2002, filed a two-count complaint against Greenwich in the federal district court. The first count (which alone is before us) claimed breach of contract for non-payment of the full amount of the bond. In due course, the district court granted summary judgment in Liberty's favor and certified this judgment as separate and final pursuant to Fed. R. Civ. P. 54(b). (Still unresolved, and not before us, are a claim by Liberty under Mass. Gen. Laws ch. 93A (2002) and counterclaims by Greenwich on several different theories.)

On appeal, Greenwich's first and most extensive argument is on the merits of Liberty's contract claim. Its position is that under the surety bond, incorporating relevant terms of the agreement between Liberty and American Tissue, it can be liable to Liberty only for the amount of $1,777,500--the sum to which the

agreement permitted American Tissue to reduce the bond once it had secured letters of credit totaling $2,172,500. Alternatively, Greenwich says that at least the bond and agreement were ambiguous, presenting an issue of fact precluding summary judgment.

The agreement provides explicitly that its terms are governed by Massachusetts law; the surety bond is silent but here the parties cite Massachusetts law as well and we accept their implicit premise. See McAdams v. Mass. Mut. Life Ins. Co., 391 F.3d 287, 298 n.5 (1st Cir. 2004). The grant of summary judgment is reviewed de novo, Dasey v. Anderson, 304 F.3d 148, 153 (1st Cir. 2002); and ordinarily contract interpretation is for the court unless disputed issues of fact bear upon the interpretation of ambiguous language. Fishman v. LaSalle Nat'l Bank, 247 F.3d 300, 303 (1st Cir. 2001).

In our view--and this too is a question of law for the court, Lanier Prof'l Servs., Inc. v. Ricci, 192 F.3d 1, 4 (1st Cir. 1999)--neither the bond nor the agreement is ambiguous in any way relevant here. By its terms, the full amount of the bond is payable upon an act of default by American Tissue, and Greenwich does not deny that such a default occurred. Nor does Greenwich claim that it did issue a substitute bond in an amount smaller than $3,700,000 or otherwise issue any rider reducing the amount of the bond.

Rather, Greenwich argues in substance that American Tissue had a right, after furnishing the second letter of credit, to reduce the bond to $1,777,500, that it took steps to do so, and that the mechanics of the reduction even if not achieved were a mere "ministerial act." It then argues that the reduction should be treated as automatic or as accomplished by the steps taken, that the reduction would carry out the intent of the parties, and that failing to reduce the amount would reward Liberty for withholding consent that it was required to provide.

There is nothing to these arguments. We will assume, as Greenwich urges, that the bond should be read in conjunction with the underlying agreement which permitted American Tissue to have Greenwich reduce the amount of the bond to $1,777,500. But the agreement said that American Tissue "may" reduce the amount; it did not say that it had to do so or that the reduction would be automatic. American Tissue started the steps to accomplish a reduction but did not complete them.

Neither American Tissue nor Greenwich acted as if a reduction were automatic. American Tissue made a specific request for a reduction; Greenwich countered that notice to Liberty would be required. The bond provided that it could not be cancelled without 60 days advance notice to Liberty. Had Greenwich or American Tissue proposed such a reduction to Liberty in mid-2001, Liberty could have raised the amount of security that it was

entitled to demand.  By mid-2001, American Tissue was missing payments and Liberty did in fact re-schedule the security required to set the bond amount at $3,700,000, bringing the total security amount required to $6,122,500.

Under both case law and general usage, the term "may" usually indicates that something is permissive, not mandatory or automatic.[3]  Yes, in rare situations, it can be read differently, cf. In re Ionosphere Clubs, Inc., 111 B.R. 436, 441 (Bankr. S.D.N.Y. 1990); but here the agreement taken as a whole--both in language and purpose--gave American Tissue a right to insist on a reduction but also allowed Liberty to counter a threatened reduction by amending the schedule upward.

This does not make the downsizing option meaningless. American Tissue did have a unilateral option--albeit never effectively exercised--to insist on a reduction in the bond amount after posting the new letter of credit, unless Liberty increased the security required.  The agreement gave Liberty absolute discretion, but if Liberty had increased the security schedule, in bad faith (say, because the existing security was and would remain patently adequate), it might well not have prevailed. See F.D.I.C. v. LeBlanc, 85 F.3d 815, 819 (1st Cir. 1996).

---

[3]See, e.g., Middlesex County v. Middlesex County Advisory Bd., 658 N.E.2d 674, 677 (Mass. 1995); Cohen v. Bd. of Water Comm'rs, 585 N.E.2d 737, 742 (Mass. 1992); Hampden Trust Co. v. Leary, 72 N.E. 88, 89 (Mass. 1904).

Greenwich's contract argument requires little further discussion. There is no evidence that the parties intended anything but what happened--so much for citations to reformation doctrine, see Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912, 917 (Mass. 1993)--and the equity maxim (that equity will treat as done that which ought to be done, see In re Cumberland Farms, Inc., 249 B.R. 341, 355-56 (Bankr. D. Mass. 2000)), is inapt where, as here, the thing allegedly to be done (a reduction in the bond) was subject to being legitimately countered by an increase in the required security.

This brings us to Greenwich's other arguments which, although briefly presented, are more interesting. The first turns on a provision of the Bankruptcy Code, 11 U.S.C. § 365(e)(1) (2000), popularly known as the ipso facto clause. Pertinently, this section prevents an executory contract or lease from being automatically terminated or modified by virtue of the other party's filing for bankruptcy. The aim is to protect the right of the bankruptcy estate to adopt, reaffirm and continue a contract or lease where this will serve the estate's interests.

In this case, the filing for bankruptcy by American Tissue was an act of default under the terms of the agreement between Liberty and American Tissue, and it was explicitly invoked by Liberty as the basis for its claim against the bond. Greenwich, noting that both it and American Tissue were liable under the bond,

says that Greenwich itself is entitled to invoke section 365(e)(1) as to any claim against it. The district court disagreed, holding that the ipso facto clause is intended to protect a bankruptcy debtor, not a third party like Greenwich.

There is a surprising paucity of precedent. A few lower court decisions favor the district court's view; one points the other way.[4] However, a careful reading of the statute and an understanding of its purpose readily confirm that--whatever protection the statute may give American Tissue in protecting its own rights vis-à-vis Liberty under the agreement--the statute in no way invalidates a separate claim by Liberty against Greenwich under the bond.

We begin with statutory language, as is normally proper. United States v. Tapia-Escalera, 356 F.3d 181, 185 (1st Cir. 2004). Greenwich correctly notes that section 365(e)(1) does not by its terms say that only the bankrupt can invoke it. But the statute also says that what may not be terminated or modified by bankruptcy is "an executory contract or unexpired lease of the debtor" or "any right or obligation under such contract or lease." This is strong

_____

[4]Compare Chrysler Fin. Corp. v. Fruit of the Loom, Inc., No. 91C-08-108-1-CV, 1993 WL 19659, *4 (Del. Super. Ct. Jan. 12, 1993) (unpublished decision); In re Prime Motor Inns, Inc., 130 B.R. 610, 613 (S.D. Fla. 1991); In re Zenith Laboratories, Inc., 104 B.R. 667, 672 (Bankr. D.N.J. 1989), with In re Metrobility Optical Sys., Inc., 268 B.R. 326, 329 (Bankr. D.N.H. 2001).

linguistic evidence that Congress was concerned with clauses diluting the bankrupt's interests--not interests of a third party.

The same result follows when one considers the purpose of the section. This purpose--avowed in both legislative history and case law--is to protect the bankruptcy estate, primarily against the loss of contractual rights that the estate might choose to assume and reaffirm.[5] Holding Greenwich liable does not modify rights of the American Tissue estate against Liberty or prevent the estate from reaffirming any contractual rights it may have under its policies with Liberty.

The parties choose to talk of the matter as if it is a question of standing, namely, who is entitled to invoke section 365(e)(1). We do not so view the problem or say that a third party can never rely on the section. Rather, our holding here rests on the proposition that the district court adjudicated in this case only a contract claim <u>by Liberty against Greenwich</u>. The bond is an independent obligation of Greenwich which happens to have been triggered by a third party's non-payments of debts and resort to bankruptcy.

---

[5]<u>See</u> S. Rep. No. 95-989 at 59 (1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5787, 5845; H.R. Rep. No. 95-595 at 348 (1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5963, 6304-05; <u>City of Covington</u> v. <u>Covington Landing Ltd. P'ship</u>, 71 F.3d 1221, 1226 (6th Cir. 1995); <u>In re Thomas B. Hamilton Co.</u>, 969 F.2d 1013, 1018 (11th Cir. 1992); <u>In re Yates Dev., Inc.</u>, 241 B.R. 247, 253 (Bankr. M.D. Fla. 1999).

It is beside the point that American Tissue may be a co-guarantor under the bond and might have a defense if sued itself. If two persons are jointly and severally liable on a contract, the fact that one has a defense (e.g., because underaged when the contract was signed) does not automatically protect the other against suit for nonperformance. See Dexter v. Blanchard, 93 Mass. (11 Allen) 365 (1865). This is not a case where a principal's obligation under the surety contract is "void." 2 Farnsworth on Contracts § 6.3 at 118 (3d ed. 2004).

Certainly as a result of paying Liberty the full amount of the bond, Greenwich will have an enlarged claim against the American Tissue estate under its indemnity agreement with American Tissue. But every increase in the estate's debt to Greenwich will likely be offset by a reduced debt of the estate to Liberty. That Greenwich chose, for the bond premium, to protect Liberty by risking the loss itself does not appear to have any visible effect on the estate's net obligations.

As its third distinct objection to the judgment, Greenwich says that the bond makes it liable upon the default to pay the full amount of the bond regardless of the actual damages to Liberty and that this invalidates the bond under Massachusetts law as an improper penalty. In Massachusetts, as in other jurisdictions, a liquidated damages clause is not allowed where

damages can readily be ascertained. See A-Z Servicenter, Inc. v.

Segall, 138 N.E.2d 266, 268 (Mass. 1956).

Possibly seeking to thwart this objection, Liberty offered to return to Greenwich any portion of the bond amount that was not needed to cover existing or potential liability of American Tissue to Liberty.  If this was a gratuitous offer by Liberty, it would not defeat an objection to the  bond under Massachusetts law; it is a different question whether the commitment could be taken as a proper reading of the bond--which has language pointing both ways--but we need not decide it because the bond is independently valid, even if the face value is payable.

Under Massachusetts law, a fixed sum specified in advance as contract damages is normally sustained if actual damages are difficult to ascertain in advance;[6] if this condition is not met, or if the amount specified is grossly disproportionate to a reasonable estimate, enforcement is denied. See Kelly v. Marx, 705

---

[6]Where "actual damages are difficult to ascertain" and where "the sum agreed upon by the parties at the time of the execution of the contract represents a reasonable estimate of the actual damages," a contract clause specifying liquidated damages will be enforced.  Kelly v. Marx, 705 N.E.2d 1114, 1116 (Mass. 1999) (quoting A-Z Servicenter, Inc. v. Segall, 138 N.E.2d 266, 268 (Mass. 1956)) (internal quotations omitted); Shawmut-Canton LLC v. Great Spring Waters of Am., Inc., 816 N.E.2d 545, 553 (Mass. App. Ct. 2004).  Kelly rejected the so-called "second-look" approach which also measures the liquidated damages "against the actual damages resulting from breach."  Kelly, 705 N.E.2d at 1116. Instead, "a judge, in determining the enforceability of a liquidated damages clause, should examine only the circumstances at contract formation."  Id.

-14-

N.E.2d 1114, 1116 (Mass. 1999).  This is Massachusetts law, so it does not matter whether it is viewed as an antique impairment of freedom of contract or a healthy protection against improvident bargains.

Greenwich argues that it is easy to ascertain how much American Tissue owes to Liberty, because as of any specific date there may be unpaid premiums and unpaid reimbursements due under the policies; but these, says Greenwich, can easily be calculated. Further, it suggests, the amounts currently due are far less than the full amount that Liberty is claiming under the bond.  Both arguments are misleading, mainly because Greenwich is understating the scope of the damage to Liberty.

The Liberty policies already described committed Liberty to make workers' compensation payments for accidents occurring within the period covered by the policies.  Such claims may entail payments to be made over many years following an accident and for periods (which may depend on changes in the victim's condition or status) that cannot be ascertained at the time of an initial award of compensation. See 7 Larson's Workers' Compensation Law § 126 (2000) (describing notice and claim periods).

Thus, Liberty's claims against American Tissue under the policies were unknown and, except by actuarial estimate, unknowable at the time that it entered into the policies and secured the bond. This is so both as to reimbursements Liberty would be entitled to

-15-

on claims not yet even made and as to premium recomputations based on actual claims experience. As it happens, although not required under <u>Kelly</u> v. <u>Marx</u>, even now the final toll is probably still unknowable.

The district court found that Liberty, when setting the security originally required, reasonably estimated the damages it would incur. Indeed, when Liberty later increased its security demand, the record shows that Liberty extrapolated from claims history and data pertaining to similar insureds. Whether it used the same method in originally setting the security is unclear but Greenwich does not challenge the finding that the estimate was reasonable.

The district court awarded Liberty just over $1 million in prejudgment interest from the date of Liberty's pre-suit demand upon the bond on October 9, 2001, until the entry of judgment on August 17, 2004. Greenwich's final claim on appeal is that Liberty is not entitled to such prejudgment interest under Massachusetts law. The relevant governing statute is Mass. Gen. Laws ch. 231 § 6C (2002), which provides:

> In all actions based on contractual obligations, upon a verdict, finding or order for pecuniary damages, interest shall be added by the clerk of the court to the amount of damages, at the contract rate, if established, or at the rate of twelve per cent per annum from the date of the breach or demand.

Greenwich argues that because the bond was issued as security for the payment obligations of American Tissue, Liberty could not sustain any loss or "pecuniary damages" under the terms of the statute except by proving specific past payments that American Tissue had failed to make. There were missed payments, but the district court did not compute interest on that basis; the liability was based on the face amount of the bond as liquidated damages for the estimated aggregate of missed payments past and future. The district court's reading of the statute was correct.

The evident thrust of the statute is to compensate a contract claimant for the deprivation of amounts due under a contract from the time they were payable to the time at which judgment is entered;[7] thereafter, if there is any delay in paying the judgment, separate post-judgment interest is due. The district court found that the full bond amount was due at the time of the demand. So both the terms of the statute and the underlying purpose--to cover loss of the use of the money during litigation--justify the award.

Greenwich cites <u>Sterilite Corp.</u> v. <u>Continental Cas. Co.</u>, 494 N.E.2d 1008 (Mass. 1986), for the proposition that the interest

---

[7]"An award of interest is made 'so that a person wrongfully deprived of the use of money should be made whole for his loss.'" <u>Sterilite Corp.</u> v. <u>Continental Cas. Co.</u>, 494 N.E.2d 1008, 1011 (Mass. 1986) (quoting <u>Perkins Sch. for the Blind</u> v. <u>Rate Setting Comm'n</u>, 423 N.E.2d 765, 772 (Mass. 1981)); <u>see also</u> <u>Interstate Brands Corp.</u> v. <u>Lily Transp. Corp.</u>, 256 F. Supp. 2d 58, 62 (D. Mass. 2003).

statute is not meant to confer a windfall but instead "is designed to compensate a damaged party for the loss of use or unlawful detention of money." Id. at 1011. Passing the question whether the statutory interest is too generous--which is a legislative judgment--the interest in this case is not a windfall; it directly and accurately compensates Liberty for being deprived of its contractual right to possess and use the $3.7 million from October 9, 2001, to the date of judgment.

Disola Dev., LLC v. Mancuso, 291 F.3d 83 (1st Cir. 2002), principally relied upon by Greenwich, is a distinguishable case of unusual, and unusually confusing, facts. It is enough to say that the amount on which the court declined to award interest under the Massachusetts statute was a frozen bank account and not a sum contractually due to the victor, and that the court interpreted a companion jury verdict for the victor as covering the time-value of the money frozen in the account during the litigation.

Affirmed.