RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0248p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

In re:  CITY OF DETROIT, MICHIGAN,

*Debtor*.

─────────────────────────────

WILLIAM OCHADLEUS, et al. (15-2194); JOHN P. QUINN (15-2337); DENNIS TAUBITZ and IRMA INDUSTRIOUS (15-2353);  LUCINDA DARRAH (15-2371);  WILLIAM DAVIS (15-2379),

*Appellants*,

*v*.

CITY OF DETROIT, MICHIGAN, et al.,

*Appellees*.

Nos. 15-2194/ 2337/ 2353/ 2371/ 2379

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:14-cv-14872—Bernard A. Friedman, District Judge.

Argued:  June 15, 2016

Decided and Filed:  October 3, 2016

Before:  BATCHELDER, MOORE, and McKEAGUE, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Jamie S. Fields, Detroit, Michigan, for Appellants in 15-2194.  John P. Quinn, Detroit, Michigan, for Appellant in 15-2337.  Dennis Taubitz, Irma Industrious, St. Thomas, Virgin Islands, for Appellants in 15-2353.  Marc N. Swanson, MILLER CANFIELD PADDOCK & STONE PLC, Detroit, Michigan, for Appellees.  **ON BRIEF:**  Jamie S. Fields, Detroit, Michigan, for Appellants in 15-2194.  John P. Quinn, Detroit, Michigan, for Appellant in 15-2337.  Dennis Taubitz, Irma Industrious, St. Thomas, Virgin Islands, for Appellants in 15-2353.  Heather Lennox, JONES DAY, Cleveland, Ohio, Beth Heifetz, Anthony J. Dick, G. Ryan

1

Snyder, JONES DAY, Washington, D.C., for Appellees. Lucinda J. Darrah, Detroit, Michigan, pro se, in 15-2371. William Davis, Detroit, Michigan, pro se, in 15-2379.

BATCHELDER, J., delivered the opinion of the court in which McKEAGUE, J., joined. MOORE, J. (pp. 16–29), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

ALICE M. BATCHELDER, Circuit Judge. This appeal arises out of the City of Detroit, Michigan's municipal bankruptcy under Chapter 9 of the Bankruptcy Code, 11 U.S.C. § 109(c). In resolving its bankruptcy, the City crafted a complex network of settlements and agreements with its thousands of creditors and stakeholders, memorialized those agreements in a comprehensive Plan, and obtained the bankruptcy court's ratification of that Plan in a final Confirmation Order. One aspect of the plan involved the reduction of certain municipal-employee pension benefits under the City's General Retirement System (GRS). Several GRS pensioners, resisting any reduction in their benefits, challenged the Confirmation Order in the district court. The City moved the district court to dismiss those actions as equitably moot and the court agreed, dismissing them pursuant to Federal Rule of Civil Procedure 12(b)(1). When those pensioners appealed here, we consolidated their appeals and, finding that equitable mootness applies and prohibits their challenges to the Confirmation Order, we AFFIRM.

**I.**

The City of Detroit filed for municipal bankruptcy on July 18, 2013, pursuant to Chapter 9 of the Bankruptcy Code, 11 U.S.C. § 109(c). At the time of filing, the City had over $18 billion in escalating debt, over 100,000 creditors, hundreds of millions of dollars of negative cash flow, crumbling infrastructure (e.g., some 78,000 abandoned structures, half classified as "dangerous"; another 66,000 blighted vacant lots; a crumbling water and sewer system; 40% nonfunctioning streetlights; outdated computer systems and software), and could not provide "the basic police, fire[,] and emergency medical services that its residents need[ed] for their basic health and safety." *In re City of Detroit*, 504 B.R. 191, 192 (Bankr. E.D. Mich. 2013).

In bankruptcy, the City crafted a series of "intricate and carefully woven" settlements with almost all of its creditors and stakeholders. Those settlements were memorialized in the Eighth Amended Plan for the Adjustment of Debts of the City of Detroit ("Plan"). After extensive hearings, the bankruptcy court confirmed the Plan in a Confirmation Order dated November 12, 2014.

The appellants here are participants in the City's General Retirement System ("GRS")—City employees, retirees, or beneficiaries thereof—who oppose the provisions of the Plan that reduce their pension benefits; that is, they want the full benefits the City promised them prior to bankruptcy. The GRS has two components: a traditional pension plan ("GRS Defined Benefit Plan" or "Pension Plan") and a 401(k)-style employee-contribution retirement savings program ("GRS Annuity Savings Fund" or "ASF"). The City is the sole sponsor of the Pension Plan and fully responsible for its funding (or deficiency thereto). The City is not responsible for funding the ASF, but some $387 million of City money had been wrongly directed into it (and distributed from it) in order to ensure each participant a promised 7.9% annual return regardless of the returns on the ASF investments, and the bankrupt City was obliged to recoup that money. That, however, would be easier said than done given the magnitude and complexity of the situation.

Moreover, the Pension Plan was underfunded by some $1.879 billion and the City did not have, and would not have, the resources to fully fund it over time. The City was therefore faced with having to reduce each GRS pension by 27%. Instead, the City orchestrated the "Grand Bargain," in which it obtained "outside funding" to bolster the Pension Plan in exchange for a settlement of GRS claims at less than the full promised pension amount. The outside funding, which totaled $816 million, came from agreements by and among the City, the State of Michigan, and certain philanthropic foundations. The "Global Retiree Settlement" between the City and the GRS Board of Trustees[1] reduced all GRS pensions by 4.5% and eliminated cost-of-living increases; reduced retiree healthcare coverage and eliminated dental, vision, and life

---

[1]The GRS is a separate legal entity; a fiduciary trust acting on behalf of the City to administer the retirement plans. It is a named defendant and appellee, but is not a participant in this appeal.

insurance; and set out a mechanism for the partial recoupment of excess ASF distributions.[2] The GRS pension claimants (designated "Class 11" for purposes of bankruptcy) voted 73% in favor of accepting the Plan, including the Grand Bargain and the Settlement.[3]

Overall, the Plan eliminated approximately $7 billion in debt and freed approximately $1.7 billion in revenue for reinvestment into City services and infrastructure, including public services, blight remediation, information technology, and public transportation. The Plan took effect on December 10, 2014, and the City began implementation immediately. As the district court noted in an opinion dated September 29, 2015, the City had by that date already issued $287.5 million in bonds and $720 million in new notes; irrevocably transferred all Detroit Institute of Art assets to a perpetual charitable trust; recouped money from all but five ASF account holders; transferred certain real property interests pursuant to separate settlement agreements within the Plan; and implemented a two-year City budget. *See In re City of Detroit*, No. 14-CV-14872, 2015 WL 5697702, at *3 (E.D. Mich. Sept. 29, 2015).[4] In its briefs on appeal, filed in January and February 2016, the City identified numerous additional aspects of the Plan that have been implemented or completed, including: the City issued over $1 billion in bonds; the State of Michigan transferred $195 million to the retirement systems; the Detroit Institute of Art and others transferred $23 million to the retirement systems; the retirement systems reduced pension amounts as planned in the Global Retiree Settlement and adopted new methods of governance and financial oversight; the City optioned the sale or lease of certain real estate, including the Joe Lewis Arena and the Windsor Tunnel; the emergency manager resigned, restoring day-to-day management to the mayor and city council; the Governor terminated the City's financial emergency status and removed the City from receivership, though maintaining

---

[2]The district court opinion explains the details of the ASF recoupment process. *See In re City of Detroit*, No. 14-CV-14872, 2015 WL 5697702, at *2-3 (E.D. Mich. Sept. 29, 2015). It is not necessary to recount that process here, but it does bear mention that it was projected to recover about $190 million, without which the Plan would have required a 13% across-the-board reduction in GRS pensions, rather than the confirmed 4.5% reduction.

[3]Class 11 claimants cast 8,541 votes: 6,248 (73%) in favor and 2,293 (27%) against. *See* Ballot Summary Report, *In re City of Detroit*, No. 13-53846, Docket No. 6179, p. 19 (Bankr. E.D. Mich., July 21, 2014).

[4]The five appeals here came from five separate district court cases and judgments, each with its own docket and case number, but the same judge decided all five and issued consistent opinions that differed only by an appellant's individualized claim or argument. Unless specifically noted, any difference is immaterial or irrelevant here and we cite only to the opinion from the *Ochadleus* case, No. 2:14-cv-14872, as representative of all five.

oversight of the City's finances via the Michigan Financial Review Commission; the City cooperated in the creation of the Great Lakes Water Authority to provide water and sewer services; the City established the Beneficiary Associations to provide healthcare to municipal retirees; the City invested millions in public services, including $8.4 million to the police department, $3.8 million to the fire department, $3.5 million for blight remediation, and $1.9 million for information technology; and the City paid to settle with certain claimholders, including $72 million on the City's limited-tax general obligation bonds (Class 7), $288 million on the City's unlimited-tax general obligation bonds (Class 8), $88 million on certificates of participation (Class 9), $493 million to the Beneficiary Associations (Class 12), $3.7 million on claims regarding the Downtown Development Authority (Class 13), and some $21 million to settle other various unsecured claims (Class 14).

Several GRS pensioners (Class 11 claimants) appealed to the district court, challenging the reduction in their pensions, the ASF Recoupment, and other things, including a release provision that prevented retirees from asserting claims against the State of Michigan. They urged the court to strike the challenged provisions from the Confirmation Order and remand to the bankruptcy court with instructions to exempt pensions from adjustment. In response, the City moved to dismiss the appeals as equitably moot and the court agreed, concluding that "[a]ll three factors of the equitable mootness analysis weigh in favor of dismissing appellants' appeal as moot: appellants did not obtain a stay; the confirmed Plan has been substantially consummated; and reversal of the Plan would adversely impact third parties and the success of the Plan." *In re City of Detroit*, 2015 WL 5697702 at *8. Granting the City's motion, the district court dismissed the appeals pursuant to Federal Rule of Civil Procedure 12(b)(1).

When those GRS pensioners appealed here, we consolidated their five separate appeals.[5] While these appellants, together, raise several diverse issues or arguments, the determinative issue is the applicability of the equitable mootness doctrine in this case, including challenges to its continued vitality as a prudential doctrine and its availability in any Chapter 9 bankruptcy

---

[5]In those five separate appeals, appellant Ochadleus (15-2194) represented 129 other named appellants; Taubitz (15-2353) represented one other named appellant; and Quinn (15-2337), Darrah (15-2371), and Davis (15-2379) each represented only themselves. For perspective: a total of 8,541 Class 11 claimants voted on the Grand Bargain and Global Retiree Settlement, meaning these 135 appellants represent about 1.5% of the Class 11 pool.

case. Ultimately, therefore, our determination that equitable mootness applies to these facts and to this Confirmation Order ends this appeal and forecloses any other claims or arguments.

## II.

We review the district court's equitable mootness determination *de novo*. *In re United Producers, Inc.*, 526 F.3d 942, 947 (6th Cir. 2008). Equitable mootness is not technically "mootness"—constitutional or otherwise—but is instead "a prudential doctrine that protects the need for finality in bankruptcy proceedings and allows third parties to rely on that finality" by "prevent[ing] a court from unscrambling complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract." *In re Ormet Corp.*, 355 B.R. 37, 40-41 (S.D. Ohio 2006) (relying on *In re Grimland, Inc.*, 243 F.3d 228, 231 (5th Cir. 2001), and *In re PWS Holding Corp.*, 228 F.3d 224, 236 (3d Cir. 2000)). That is, unlike conventional mootness, equitable mootness is not concerned with the court's ability or inability to grant relief; it is concerned with protecting the good faith reliance interests created by implementation of the bankruptcy plan from being undone afterwards. *See In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994) ("There is a big difference between *inability* to alter the outcome (real mootness) and *unwillingness* to alter the outcome ('equitable mootness').").

More akin to waiver or forfeiture (or perhaps estoppel) than to conventional mootness, equitable mootness is "grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable." *See In re United Producers*, 526 F.3d at 947 (internal quotation marks omitted). Stated bluntly, equitable mootness negates appellate review of the confirmation order or the underlying plan, regardless of the problems therein or the merits of the appellant's challenge. *Cf. In re Made in Detroit, Inc.*, 414 F.3d 576, 581 (6th Cir. 2005).

We analyze equitable mootness under a three-part test: (1) whether a stay has been obtained; (2) whether the plan has been "substantially consummated"; and (3) whether the relief requested would significantly and irrevocably disrupt the implementation of the plan or disproportionately harm the reliance interests of other parties not before the court. *See In re*

*United Producers*, 526 F.3d at 947-48 (quotation marks and citations omitted).  Whether a stay of implementation of the plan has been obtained is significant because:

> When an appellant does not obtain a stay of the implementation of a confirmation plan, the debtor will normally implement the plan and reliance interests will be created.  Thus, the failure to obtain a stay will count against the appellant in determining whether an appeal should be denied on equitable mootness grounds. The failure to seek a stay . . . is not necessarily fatal . . . [but neither is merely seeking a stay sufficient in and of itself, as] a stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization.

*Id.* at 948 (quotation marks, editorial marks, citations, and paragraph break omitted).

We measure "substantial consummation" by the Bankruptcy Code definition, which considers the extent of the debtor's transfer of property, assumption of responsibilities, and distribution of assets as prescribed by the plan.  *See* 11 U.S.C. § 1101(2).  "If a plan has been substantially consummated there is a greater likelihood that overturning the confirmation plan will have adverse effects on the success of the plan and on third parties."  *In re United Producers*, 526 F.3d at 948.  But even after substantial consummation, equitable mootness is not necessarily appropriate.  *Id.*  The most important factor is whether the relief requested would affect the rights of third parties or the overall success of the plan.  *Id.*  This requires a case-by-case assessment of the feasibility and effect of the relief requested, and determination of "whether it amounts to a piecemeal revision of the plan or a wholesale rewriting of it."  *Id*.

In this case, all three factors favor the application of equitable mootness: the appellants did not obtain a stay; the Plan has been substantially consummated, inasmuch as numerous significant—even colossal—actions have been undertaken or completed, many irreversible; and the requested relief of omitting the bargained-for (and by majority vote agreed-upon) pension reduction would necessarily rescind the Grand Bargain, its $816 million in outside funding, and the series of other settlements and agreements contingent upon the Global Retiree Settlement, thereby unravelling the entire Plan and adversely affecting countless third parties, including, among others, the entire City population. *See In re City of Detroit*, 2015 WL 5697702 at *8.

This is not a close call.  In fact, the doctrine of equitable mootness was created and intended for exactly this type of scenario, to "prevent[] a court from unscrambling complex

bankruptcy reorganizations" after "the plan [has become] extremely difficult to retract." *See Nordhoff Investments, Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 185 (3d Cir. 2001). The Grand Bargain was contingent on the Global Retiree Settlement as negotiated. Altering the pension reduction would mean rescinding the Global Retiree Settlement and, consequently, nullifying the Grand Bargain. Given the immensity of the Grand Bargain, even within this enormous bankruptcy, such a drastic action would unavoidably unravel the entire Plan, likely force the City back into emergency oversight, and require a wholesale recreation of the vast and complex web of negotiated settlements and agreements. At this point, the harm to the City and its dependents—employees and stakeholders, agencies and businesses, and 685,000 residents—so outweighs the harm to these appellants that granting their requested relief and unravelling the Plan would be "impractical, imprudent, and therefore inequitable." *See In re United Producers*, 526 F.3d at 947. In short, this is the scenario that equitable mootness was designed to avoid.

### III.

The appellants raise two challenges without regard to the particular facts of this case. First, they argue that equitable mootness, being an abdication of our jurisdiction on prudential grounds, is no longer a viable doctrine under the Supreme Court's evolving case law. In the alternative, they argue that equitable mootness does not apply in Chapter 9 bankruptcies.[6]

### A.

The appellants point to recent Supreme Court opinions in which the Court reversed judgments that had dismissed cases on prudential grounds, and emphasize the Court's language in those opinions about the obligation of the federal courts to decide cases within their jurisdiction. *See, e.g., Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014) (reversing a dismissal based on "prudential standing" or "statutory standing,"

---

[6]A frequent misnomer in the appellants' briefing warrants mention here: despite their misleading headings and attempts at limiting language, many of the appellants' specific reasons or arguments against extending equitable mootness beyond its established Chapter 11 context and into Chapter 9 are actually arguments against the viability of equitable mootness at all, in any bankruptcy chapter. If we were to accept these arguments as a reason to preclude equitable mootness in Chapter 9, we would correspondingly be accepting (and endorsing) a reason to abolish equitable mootness altogether. But, as we explain in § III.A, that is something we cannot do. We, therefore, decline to address any of these arguments or reasons individually and instead reject them all categorically under the reasoning in § III.A. In § III.B, we address only the arguments that distinguish Chapter 9 from Chapter 11.

though the issue was whether the statute authorized suit by the named plaintiff); *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014) (questioning but declining to "resolve the continuing vitality of the prudential ripeness doctrine," upon acknowledging its "tension with [the Court's] recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging" (quotation marks and citations omitted)); *Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012) (emphasizing the narrowness of the judicial-question doctrine, and opining that "the Judiciary has a responsibility to decide cases properly before it, even those it would gladly avoid" (quotation marks and citation omitted)).

That is a fair reading of those cases and the inference drawn is not unreasonable: the Supreme Court has expressed disfavor for prudential doctrines that abdicate jurisdiction and has emphasized the duty federal courts have to exercise jurisdiction. But those are not bankruptcy cases and their holdings neither expressly nor necessarily extend to equitable mootness.

More importantly, even if the Supreme Court would abolish equitable mootness, it has not yet done so (nor has any circuit). Equitable mootness is the law of the Sixth Circuit, *see In re United Producers*, 526 F.3d at 947, and we continue to apply it, *see In re Schwartz*, 636 F. App'x 673 (6th Cir. 2016). Consequently, we cannot reject it or abolish it in this appeal. *See Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) (explaining that one panel cannot overrule the decision of another panel). Equitable mootness is a viable doctrine.

**B.**

The appellants also argue that even if equitable mootness survives, it does not apply in Chapter 9 cases.[7] As they point out, we in the Sixth Circuit have never before applied equitable mootness in a Chapter 9 case, applying it until now only in Chapter 11 cases. Several other courts have extended it to Chapters 7 and 13, but only three opinions nationwide have ever applied it in Chapter 9, and those did so with little analysis. *See Alexander v. Barnwell Cnty. Hosp.*, 498 B.R. 550 (D.S.C. 2013); *In re City of Vallejo*, 551 F. App'x 339 (9th Cir. 2013); *In re City of Stockton*, 542 B.R. 261, 273-74 (9th Cir. BAP 2015) (citing with approval *In re City of*

---

[7]*See* footnote 6, *supra.*

*Detroit*, 2015 WL 5697779, on appeal here, and rejecting or distinguishing *Bennett*, *see infra*, "because the constitutional and political concerns that troubled [it] [we]re not present").

The appellants, however, rely on the only other opinion to consider equitable mootness in the Chapter 9 context, an Alabama district court case (currently pending on appeal in the 11th Circuit) that declared equitable mootness inapplicable in Chapter 9 cases: *Bennett v. Jefferson County*, 518 B.R. 613 (N.D. Ala. 2014). In *Bennett*, when Jefferson County was forced into bankruptcy by the overwhelming cost of its sewer system, one aspect of its plan was a drastic increase in sewer rates; the *Bennett* appellants (representing all municipal "Ratepayers" and designated as such) claimed that the increase in rates—without vote or voter approval—violated the state constitution. *Id*. at 628-29. Jefferson County moved to dismiss the appeal on the basis of equitable mootness, but the court refused, because, among other reasons, the County-Ratepayer relationship was significantly different from the normal debtor-creditor relationship in a Chapter 11 bankruptcy. *See id*. at 634-35. As the sole public-utility-sewer-service provider, Jefferson County was a monopoly enterprise and the Ratepayers were captive customers whose only protection from such increases was the political process (i.e., the right to vote on proposed rate increases and the office holders responsible), which the bankruptcy order denied them:

> The Ratepayers are not investors or shareholders whose stake in this case is limited to the amount of their investment; they are citizens of the County dependant [sic] upon the County for provision of basic sewer service. As such, they are the revenue source for payment of the New Sewer Warrants; however, their interest is not limited to a finite financial amount. Rather, their interest in continuing to receive essential sewer service is not protected by the political system of County governance nor do they have a voice in future rate-making.

*Id*. at 638 (footnote omitted). The *Bennett* court denied Jefferson County's motion to dismiss on the basis of equitable mootness and allowed the appeal to proceed on the merits. *Id.* at 640.

Even though the circumstances in *Bennett* are validly distinguished from the usual equitable mootness scenario, this does not require the conclusion that equitable mootness does not apply in *any* Chapter 9 case. Instead, the better conclusion drawn from *Bennett*'s facts is that Jefferson County could not meet the third equitable mootness factor under a "case-by-case" assessment," *see In re United Producers*, 526 F.3d at 948. Because of the unusual

circumstances, the potential harm to third-party reliance interests from unraveling the Jefferson County plan would not outweigh the harm inflicted on those captive Ratepayer "creditors" by allowing the plan's drastic rate increase to go unchallenged. Consequently, the application of equitable mootness was not appropriate (i.e., not equitable) in that particular fact scenario.

In the present case, the GRS pensioners/appellants were promised an amount certain and, though perhaps not traditional "creditors" in the most ordinary sense, they are—importantly— not non-party, captive customers like the Ratepayers in *Bennett*, at risk of being subjected to an unlimited financial obligation, namely, a 365% rate increase to continue forever. Moreover, unlike the Ratepayers in *Bennett* who were denied a vote on that increase (that being their primary complaint, in fact), these pensioners, as Class 11 claimants, *were* given a vote on the pension reduction and 73% of the Class voted for it. Presumably, the appellants here voted against it, but they *were* given an opportunity in public hearings to present argument and evidence, and they were given a vote.[8]

The facts in *Bennett* are drastically different from the facts in this case, and *Bennett*'s rationale and conclusion are simply not applicable here, where we do not have a deprivation of the political process, a class of otherwise uninvolved participants (captive customers) as creditors, or imposition of an unlimited price increase on them. Moreover, one could reasonably submit that *Bennett*'s especially unusual facts make it a poorly suited case for a universal proclamation that equitable mootness *never* applies in Chapter 9 bankruptcies. But the *Bennett* opinion contains no hesitancy or self-restraint, announcing unequivocally that "equitable mootness does not apply to challenges to a Confirmation Order in Chapter 9 proceedings." *Bennett*, 518 B.R. at 635.

In rejecting Jefferson County's contention that equitable mootness applies "in Chapter 9 appeals exactly as it applies in Chapter 11 appeals," *id.*, the *Bennett* opinion touts the differences between Chapter 9 "municipal reorganization" and Chapter 11 "general reorganization": "first,

---

[8]Note that the parameters of these two "votes" are drastically different, in that the vote denied the Ratepayers in *Bennett* was either a public referendum on the sewer rate increase or a county-wide general election of the responsible public office-holders, whereas the vote here was merely a majority vote on the acceptance or rejection of the Global Retiree Settlement by the bankruptcy's specific "Class 11 claimant" creditors.

the law must be sensitive to the issue of the sovereignty of the States; [] second, a municipality is generally not a business enterprise operating for profit[] and there are no stockholders." *Id*. at 636 (quotation marks, editorial marks, citations, and footnote omitted). And, third, the "prudential concerns" or "underlying policies" are different: the "policies underlying Chapter 11 are preserving going concerns and maximizing property available to satisfy creditors," whereas "[t]he policy underlying Chapter 9 is not future profit, but rather continued provision of public services." *Id.* (quotation marks, editorial marks, and citations omitted). This is an accurate description of differences, to be sure, but the *Bennett* opinion never explains *why these differences matter*; why, based on these differences, would equitable mootness apply in Chapter 11 but not Chapter 9?**9**

The simple answer is that these differences do not matter. The fact that the debtor is a municipality, with state sovereignty,**10** rather than a business enterprise does not reduce the municipal debtor's rights in bankruptcy. Actually the opposite is true: "Many of the protections afforded to creditors in the other [bankruptcy] chapters are missing in [C]hapter 9." *In re City of Desert Hot Springs*, 339 F.3d 782, 789 (9th Cir. 2003) (cited in the *Bennett* opinion). "Chapter 9 provides a [municipal] debtor with an array of bankruptcy powers to enable it to achieve financial rehabilitation with very few, if any, corresponding limitations and duties of the type to

---

**9**The *Bennett* opinion does explain at length why one difference matters and, ultimately, relies exclusively on that one difference to justify its rejection of equitable mootness; that difference is that municipalities, unlike business enterprises, provide public services and engage in the political process. *See Bennett*, 518 B.R. at 636-38; at 636 ("the interest of the public in the provision of governmental services"); at 637 ("place substantial future financial obligations on the citizens of Jefferson County without representation"); at 637 ("the County's ceding of its future authority to set sewer rates to the bankruptcy court . . . would not arise in private contracts under a Chapter 11 plan"); at 638 (under the plan, the citizens' "interest in continuing to receive essential sewer service is not protected by the political system of County governance nor do they have a voice in future rate-making").

Importantly, that is the very difference discussed in the preceding four paragraphs above, the difference that necessarily distinguishes *Bennett* from the present case. Because this concern about public services and political process does not arise in every Chapter 9 bankruptcy case—as it clearly does not arise in the present case—it is not a valid reason to conclude that equitable mootness does not apply in *any* Chapter 9 bankruptcy case.

**10**Because *Bennett*'s forceful but aimless language about this sovereignty issue does not articulate why it matters to the applicability of equitable mootness, and therefore could be misread as questioning the constitutionality of municipal bankruptcy itself, *see* 518 B.R. at 636 ("Chapter 9 places federal law in juxtaposition to the rights of states to create and govern their own subdivisions"), it bears mention that Chapter 9 municipal bankruptcy is constitutional. *See United States v. Bekins*, 304 U.S. 27, 51 (1938); *see also Franklin Calif. Tax-Free Trust v. Puerto Rico*, 805 F.3d 322, 327 (1st Cir. 2015) (*affirmed*, 579 U.S. --, 136 S. Ct. 1938 (2016)); *In re City of Detroit*, 504 B.R. 97, 136-54 (Bankr. E.D. Mich. 2013) (analyzing the constitutionality of Chapter 9 in this case).

which a Chapter 11 debtor is subject." *Id*. (quotation marks, editorial marks, and citations omitted). That is, the statutory differences generally favor the Chapter 9 municipal debtor.

Moreover, the fact that a municipality does not operate for profit, have shareholders, or risk liquidation (factors warranting a plan's "maximizing property available to satisfy creditors" upon liquidation) does not mean that a municipality has any less interest in finality or good faith reliance on the effectuation of its bankruptcy plan. In this case, the City of Detroit not only had numerous stakeholders and employees—on a scale equivalent to even a very large business enterprise—it also had over 100,000 creditors and 685,000 residents relying on its Plan. As the district court put it: "If the interests of finality and reliance are paramount to a Chapter 11 private business entity with investors, shareholders, and employees, [thus justifying equitable mootness,] then these interests surely apply with greater force to the City's Chapter 9 Plan, which affects thousands of creditors and residents." *In re City of Detroit*, 2015 WL 5697702 at *5.

On appeal, the appellants attempt to complete *Bennett*'s reasoning as to why, based on the differences between Chapter 11 and Chapter 9, equitable mootness should apply in Chapter 11 but not Chapter 9. They have three basic theories. In one, they argue that the purpose of equitable mootness is to protect a business in Chapter 11 reorganization from the "catastrophic consequence" of compelled liquidation and, because liquidation is not an option in Chapter 9, equitable mootness does not apply in Chapter 9. This is not persuasive. We do not agree that protection against liquidation is the sole purpose of equitable mootness, or even a necessary purpose. Rather, the dual purposes most commonly attributed to equitable mootness are to achieve finality in bankruptcy proceedings and to protect the good faith reliance interests created by implementation of the bankruptcy plan. But as we have already explained, these purposes apply with as much force in Chapter 9 cases—particularly this one—as in Chapter 11, and possibly more.

Their second theory is premised on the fact that "substantial consummation," the second element of equitable mootness, is a term specifically defined in Chapter 11 for Chapter 11, *see*

11 U.S.C. § 1101(2),[11] but does not appear in Chapter 9, *see* 11 U.S.C. §§ 103(f), 103(g), & 901(a). Thus, they argue that, because "substantial consummation" is required for equitable mootness but omitted from Chapter 9, the entire doctrine of equitable mootness is barred from Chapter 9. But equitable mootness is a doctrine outside of the Code entirely, both Chapters 11 and 9. It did not require, at conception, any codified definitions or terms; it did, however, require, as a qualifying element, a conceptual means "to determine the extent to which the plan ha[d] progressed," *In re United Producers*, 526 F.3d at 948, and the means chosen is the § 1101(2) definition of substantial consummation. To be sure, the court could have crafted its own definition, adopted one from elsewhere (such as contract or tort law), or even appropriated the § 1101(2) language without citation. Simply put, we cannot agree that the use of a codified definition as an element necessarily places the entire non-Code doctrine within the exclusive confines of that definition's particular Code chapter. Rather than restrict equitable mootness to Chapter 11, we would be better served by merely removing the citation to § 1101(2) and allowing the written definition to stand on its own terms. On its own terms, "substantial consummation" applies just as well in Chapter 9 circumstances as it does in Chapter 11.[12]

The third theory on which the appellants proceed starts with the fact that, while Chapter 11 empowers the court to modify the plan, Chapter 9 authorizes only the debtor municipality to modify the plan; the court cannot. *See* 11 U.S.C. §§ 941, 942. From this they argue that a debtor municipality could refuse all but the most extreme modification, one that would necessitate a wholesale rewriting of the plan and detrimentally affect the rights of third parties, thereby satisfying the main equitable mootness element in any Chapter 9 case. But such a refusal would be an act of bad faith, if the claimants were to seek only a "piecemeal revision" of the plan (that would neither disrupt its overall implementation nor harm the reliance interests springing from it) but the debtor municipality stubbornly and without cause refuses that modification. So this

---

[11]This provision says: "In this chapter [Chapter 11] . . . 'substantial consummation' means--(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." 11 U.S.C. § 1101(2).

[12]Another way of looking at this is to recognize, as the appellants themselves have in their briefs, that Congress intended § 1101(2) to apply to specific Code provisions establishing cause for conversion or dismissal, § 1112(b)(4)(M), and limiting the time for plan modification, § 1127(b), not to equitable mootness.

argument is that the municipal debtor could act in bad faith and the court would be powerless to stop it. We are confident that a court would recognize such obvious bad faith misconduct, or the appellant would bring it to the court's attention, and that the court could capably determine what lesser modification a debtor municipality *could* enact if so inclined. Moreover, given that equitable mootness is an *equitable* doctrine, the court would be obliged to fully consider that bad faith misconduct.

Ultimately, we do not find any of these three theories any more persuasive than *Bennett* itself, which we do not find compelling in the present circumstances. Considering the foregoing and the reasons stated by the district court, we conclude that equitable mootness applies to Chapter 9 cases just as it applies to Chapter 11. In fact, considering the particular facts of this case, equitable mootness likely applies "with greater force to the City's Chapter 9 Plan, which affects thousands of creditors and residents," *see In re City of Detroit*, 2015 WL 5697702 at *5.

**IV.**

For the foregoing reasons, we AFFIRM the judgment of the district court.

_____

**DISSENT**

_____

KAREN NELSON MOORE, Circuit Judge, dissenting. Judicial restraint is an undeniable virtue, but its pursuit should not lead to judicial abdication. This case illustrates how a decision *not* to decide a case can be the most consequential decision of all.

As every first-year law student learns, it is our job as judges "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). With this power, however, comes great responsibility. *Cf. Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2415 (2015). At times, we must recognize our own limits and decline to decide matters that are properly left to another day or a more concrete dispute, *e.g.*, *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (prohibition on deciding moot cases); *Muskrat v. United States*, 219 U.S. 346, 354, 357–58 (1911) (prohibition on giving advisory opinions), or avoid those issues that fall within the province or expertise of another branch of government, *see Baker v. Carr*, 369 U.S. 186, 217 (1962) (courts should avoid deciding "political questions"). Often, however, we must decide the hard cases— even when we would rather not, and even if the legally correct decision results in an outcome that we dislike.

The current trend at the Supreme Court is toward a greater recognition of our "virtually unflagging obligation . . . to exercise the jurisdiction given [us]." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (first alteration in original) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 821 (1976)). Where once we relied on "prudential" doctrines that used jurisdictional jargon to justify deciding not to decide a case, *e.g.*, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11–12 (2004), the Supreme Court is now skeptical of such self-imposed straitjackets, *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014). At bottom, this is a recognition that it is rarely our job as judges to decline to exercise our judicial power in a case that is otherwise within our jurisdiction. "Just as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, it cannot limit a cause of action that Congress has created

merely because 'prudence' dictates." *Lexmark*, 134 S. Ct. at 1388 (internal citation omitted). Deciding not to decide can thus be a form of judicial overreach, not restraint. *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution"); *see also New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 359 (1989) ("Underlying these assertions is the undisputed constitutional principle that Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds.").

In its zeal to avoid the merits of this case, the Majority extends an already questionable prudential doctrine to a context in which it has no place. This is not only a derogation of our "virtually unflagging obligation" to decide cases within our jurisdiction, *Quackenbush*, 517 U.S. at 716 (quoting *Colorado River*, 424 U.S. at 821), but it has real-world consequences for the litigants before us—retirees who spent their lives serving the people of Detroit through boom and bust, and who feel that the City's bankruptcy was resolved through a game of musical chairs in which they were left without a seat. These litigants believe that their rights were violated by the agreement that resulted in the settlement of Detroit's bankruptcy—the largest municipal bankruptcy in our nation's history. By declining to review the bankruptcy court's assessment of these claims, the district court and the Majority ensure that they will never be heard by an Article III judge. Although I do not doubt the expertise that a bankruptcy judge brings to a case of this magnitude and complexity, having one's case decided by an Article III judge is no mere formality. The protections of Article III "help to ensure the integrity and independence of the Judiciary," *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1938 (2015), and Article III supervision of bankruptcy judges is key to the constitutionality of the bankruptcy-court system that adjudicated the retirees' claims, *id.* at 1946.

The doctrine that the Majority uses to avoid the retirees' legal claims is "equitable mootness." As applied here, equitable mootness suggests that the importance of adjudicating the retirees' rights pales in comparison to the importance of protecting the expectations of lenders and others who have *chosen* to rely on Detroit's bankruptcy plan before appellate challenges to it were resolved. I fear that using such a justification to brush aside the retirees' legal claims will

leave them with the impression that their rights do not matter. That the doctrine used to avoid their claims is a judicial invention with almost no legal basis only pours salt on the wound. Whatever the merits of the retirees' claims, this is lamentable, and I respectfully dissent.

## I.

The doctrine of equitable mootness hypothesizes that many will rely on a bankruptcy plan after it has been confirmed by a bankruptcy court, but before an appeal of that confirmation has been resolved. Equitable mootness suggests that protecting these reliance interests can be important enough that an appeal contesting the confirmation of a bankruptcy plan should not be heard. It is, as then-Judge Alito put it, a "curious doctrine," which "permit[s] federal district courts and courts of appeals to refuse to entertain the merits of live bankruptcy appeals over which they indisputably possess statutory jurisdiction and in which they can plainly provide relief." *In re Continental Airlines*, 91 F.3d 553, 567 (3d Cir. 1996) (en banc) (Alito, J., dissenting), *cert. denied*, 519 U.S. 1057 (1997). Despite the name, equitable mootness bears no relation to "mootness." Indeed, in an equitably moot appeal, the relief sought is the opposite of moot—the consequences of granting it would be so great that they are deemed inequitable. Nor is equitable mootness the same as "statutory mootness," which applies when certain provisions of the bankruptcy code specifically bar appeals from certain un-stayed bankruptcy-court orders. *See, e.g.*, *In re Made in Detroit, Inc.*, 414 F.3d 576, 580–83 (6th Cir. 2005).

Although the doctrine of equitable mootness has been adopted by our circuit—and, I admit, every other circuit to consider its vitality—its legal foundations are shaky, at best. I recognize that our panel is bound to our precedent applying the doctrine, but the City of Detroit does not request a straightforward application of that precedent. Rather, the City asks us to extend the doctrine from its roots in Chapter 11 of the Bankruptcy Code to a case arising under the municipal-bankruptcy provisions of Chapter 9. The Majority agrees to do so, holding that the same need to protect reliance interests that motivated our adoption of the doctrine in Chapter 11 cases are present in Chapter 9 cases. That misses the point. Equitable mootness cannot apply every time that a district court's decision engenders strong reliance interests; if that were the case, it could apply to every appeal we hear. Rather, there must be some legal basis for us to

decline to hear appeals that may upset such reliance interests in the first place. Although there is but a thin veneer of legal grounding for such a doctrine in Chapter 11 cases, this justification rubs off when the case is a Chapter 9 bankruptcy. I begin by analyzing in Part A the meager textual basis proffered for the equitable-mootness doctrine. I then turn in Part B to other concerns with the doctrine. In Part C, I explain why these concerns, along with the specific context of Chapter 9, suggest that we are neither bound nor able to hold that equitable mootness applies to Chapter 9 cases.

**A. Equitable Mootness Is Not Justified by the Bankruptcy Code.**

Our circuit's decisions adopting equitable mootness provide little explanation of the legal basis for the doctrine, so I begin with an overview of the doctrine's history. Equitable mootness was initially grounded in the 1976 version of Bankruptcy Rule 805, which had the same effect as current provisions of the Bankruptcy Code codified at 11 U.S.C. §§ 363(m) and 364(e):

> Unless an order approving a sale of property or issuance of a certificate of indebtedness is stayed pending appeal, the sale to a good faith purchaser or the issuance of a certificate to a good faith holder shall not be affected by the reversal or modification of such order on appeal, whether or not the purchaser or holder knows of the pendency of the appeal.

*In re Roberts Farms, Inc.*, 652 F.2d 793, 796 (9th Cir. 1981) (quoting Fed. R. Bankr. P. 805 (1976)). In 1981, the Ninth Circuit suggested that this Rule embodied a broader policy that could be applied to bar appeals from an order confirming a bankruptcy plan of reorganization where certain "property transactions do not stand independently and apart from the plan of arrangement." *Id.* at 797. Although this decision was later cited to support the denial of appellate review of reorganization plans without analysis of whether they were intertwined with property transactions that could not be disputed as a matter of statute, *Roberts Farms* is best interpreted as a limited decision that stands for the proposition that appeals of orders confirming reorganization plans may "not be entertained [when] no relief [is] practicable as a result of the many post-confirmation transactions that were irreversible due to this provision of former Rule 805." *Continental Airlines*, 91 F.3d at 569 (Alito, J., dissenting).

Despite this seemingly clear way to cabin *Roberts Farms*, the Seventh Circuit subsequently constructed a fuller explanation for the budding doctrine of equitable mootness, relying on "[s]everal provisions of the Bankruptcy Code . . . [that] provide that courts should keep their hands off consummated transactions." *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir.), *cert. denied*, 513 U.S. 999 (1994). First, it pointed to 11 U.S.C. § 363(m), which " says that the reversal of an order authorizing the sale or lease of property of an estate 'does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal.'" *Id.* (quoting 11 U.S.C. § 363(m)). Second, the Seventh Circuit pointed to 11 U.S.C. § 1127(b), which "dramatically curtails the power of a bankruptcy court to modify a plan of reorganization after its confirmation and 'substantial consummation'"—although the Seventh Circuit acknowledged that § 1127(b) "does not place any limit on the power of the court of appeals." *Id.* (quoting 11 U.S.C. § 1127(b)). From these two provisions, the Seventh Circuit divined a policy in favor of "preserving interests bought and paid for in reliance on judicial decisions, and avoiding the pains that attend any effort to unscramble an egg." *Id.* This policy, the Seventh Circuit held, was "so plain and so compelling that courts fill the interstices of the Code with the same approach." *Id.*

The doctrine quickly made its way to our circuit, although we have never examined the legal basis for it. In an unpublished decision in 1995, we applied what seemed to be equitable mootness, holding that a bankruptcy appeal was moot because "[i]t would be a hardship and unfair to all parties to go back [on the reorganization plan]," and equating this to a finding that "this court is without the ability to provide the relief requested." *Bennett v. Veale*, Nos. 93-3016, 93-4180, 1995 WL 385147, at *2–3 (6th Cir. June 27, 1995). Later that year, we were confronted with an equitable-mootness argument, but concluded that "[t]he record in this case is inadequate to sustain the [defendant's] equitable estoppel argument." *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1226 (6th Cir. 1995). We nevertheless suggested that equitable mootness applied to Chapter 11 appeals. *Id.* at 1225 ("A growing number of cases outside this circuit recognize that 'a plan of reorganization, once implemented, should be disturbed only for compelling reasons.'" (quoting *UNR Indus.*, 20 F.3d at 769)). We applied the

doctrine in 1998, relying on *Bennett*, *City of Covington*, and the Seventh Circuit's decision in *UNR*. *See In re Eagle Picher Indus., Inc.*, Nos. 96-4309, 97-4260, 1998 WL 939869, at *4–5 & nn.7–8 (6th Cir. Dec. 21, 1998).[1] In recent years, the doctrine has become embedded in our case law, although we have yet to explore its legal basis in any detail, relying instead on our decision in *City of Covington*. *See In re Schwartz*, 636 F. App'x 673, 675–77 (6th Cir. 2016); *In re United Producers, Inc.*, 526 F.3d 942, 947 (6th Cir. 2008); *In re Am. HomePatient, Inc.*, 420 F.3d 559, 563 (6th Cir. 2005), *cert. denied*, 549 U.S. 942 (2006).

Other circuits have adopted the doctrine with similarly minimal exploration of its legal basis. *See In re Semcrude, L.P.*, 728 F.3d 314, 317 (3d Cir. 2013) ("Courts have rarely analyzed the source of their authority to refuse to hear an appeal on equitable mootness grounds."). Indeed, "[a]lthough the equitable mootness doctrine is embraced in every circuit, the rationale underlying the doctrine is unsettled at best." Ryan M. Murphy, Equitable Mootness Should Be Used as a Scalpel Rather than an Axe in Bankruptcy Appeals, 19 J. Bankr. L. & Pract. 1 Art. 2 (2010). At a minimum, as the Solicitor General wrote in unsuccessfully seeking certiorari on the issue, the doctrine "is a relatively recent judicial construct of questionable foundation." Pet'n for a Writ of Certiorari, *United States v. GWI PCS 1, Inc.*, No. 00-1621, 2001 WL 34124814, at *22 (Apr. 2001). Only a handful of decisions have analyzed its basis, and the Seventh Circuit's statutory-gap-filling rationale from *UNR* remains "[t]he most plausible basis." *In re Semcrude*, 728 F.3d at 317.

Given the dearth of explanation of the legal basis for the equitable-mootness doctrine, criticism has begun to mount. This criticism focuses on the doctrine's questionable textual moorings: "Although the Bankruptcy Code forbids appellate review of certain un-stayed orders and restricts post-confirmation plan modifications, it does not expressly limit appellate review of plan confirmation orders." *In re Pacific Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009) (footnotes omitted). Judge Krause recently put it best: "[A]s courts and litigants . . . have struggled to identify a statutory basis for the doctrine, it has become painfully apparent that there

---

[1] In 1999, we declined to dismiss an appeal as equitably moot, but did so because the relief sought would not upset the bankruptcy plan. *See In re Arbors of Houston Assocs. Ltd. P'ship*, No. 97-2099, 1999 WL 17649, at *2–3 (6th Cir. Jan. 4, 1999).

is none." *In re One2One Commc'ns, LLC*, 805 F.3d 428, 438 (3d Cir. 2015) (Krause, J., concurring).

The Seventh Circuit's *UNR* decision does not supply a persuasive explanation of the doctrine's source. The provisions on which *UNR* was based are specifically targeted, and do not apply to orders confirming bankruptcy reorganization plans. 11 U.S.C. § 363(m) provides a basis for finding *statutory* mootness when an appeal is from an un-stayed order authorizing the bankruptcy trustee to sell or lease property from the debtor's estate. *See Made in Detroit*, 414 F.3d at 580–83. And 11 U.S.C. § 1127(b) merely provides that "[t]he proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan," but says nothing about the authority of the district or circuit court to modify a plan due to a legal infirmity in its confirmation. *See One2One*, 805 F.3d at 443–44 (Krause, J., concurring) ("Section 1127(b) provides even less support for equitable mootness, as it only restricts a *party's* ability to modify a plan before confirmation; it says nothing about the powers of bankruptcy courts or appellate courts."). If anything, the existence of such narrow provisions withholding review or precluding modification in certain circumstances suggests "[u]nder the maxim of *expresio unius est exclusio alterius*," that "Congress's express inclusion of two bankruptcy-law exceptions to appellate review indicates an intent to preclude recognition of others." Pet'n for a Writ of Certiorari, *United States v. GWI PCS 1, Inc.*, No. 00-1621, 2001 WL 34124814, at \*23 (Apr. 2001); *see also One2One*, 805 F.3d at 444 (Krause, J., concurring) ("Because Congress specified certain orders that cannot be disturbed on appeal absent a stay, basic canons of statutory construction compel us to presume that Congress did *not* intend for other orders to be immune from appeal.").

Not only is it a stretch to find textual support for equitable mootness, but statutory provisions regarding bankruptcy appeals arguably preclude the doctrine. Congress has plainly authorized appeals from confirmation orders, 28 U.S.C. §§ 157–158, so *UNR*'s federal-common-law theory suggests that federal courts may refuse to hear appeals that are plainly permitted by statute solely because 11 U.S.C. §§ 363(m) and 1127(b) imply a general policy against upsetting reliance interests. This is far from the usual situation in which a federal court is permitted to exercise its common-law-making authority "to fill the interstices of a pervasively federal

framework" as a result of "an implied delegation by Congress of lawmaking authority to the federal courts." 19 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman, and Catherine T. Struve, Federal Practice and Procedure § 4516 (2d ed. 2016). Such congressional intent is wholly lacking here, and "[w]hile the federal courts must fill statutory gaps in some exceptional circumstances, we may not stretch a statute to create such gaps . . . ." *One2One*, 805 F.3d at 444 (Krause, J., concurring) (internal citation omitted).

In sum, the doctrine of equitable mootness enjoys minimal textual support, if any; at the same time, it contradicts the relevant appellate-jurisdiction statutes and purports to authorize the making of federal common law despite the complete lack of evidence that Congress intended to delegate such authority to the courts. This is not a strong foothold.

**B.**      **Equitable Mootness Is an Inappropriate Prudential Doctrine that Upsets the Constitutional Balance on which the Bankruptcy-Court System is Based.**

Applying a doctrine that has no basis in the text of any statute or in Article III to avoid hearing appeals from bankruptcy-court decisions also raises separation-of-powers concerns. Divorced as it is from any statutory basis, equitable mootness is nothing but a prudential doctrine of "judicially self-imposed limits." *Newdow*, 542 U.S. at 11 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)) (discussing prudential standing); *see Nordhoff Invs., Inc. v. Zenith Elec. Corp.*, 258 F.3d 180, 184 (3d Cir. 2001) (the doctrine "is more accurately denominated as 'prudential mootness'" (quoting *In re Box Bros. Holding Corp.*, 194 B.R. 32, 45 (Bankr. D. Del. 1996))). However "prudential" equitable mootness may be, it operates to cut off entirely a litigant's right to appeal in a case that would otherwise be within our appellate jurisdiction. Such a self-imposed straitjacket contradicts our "'virtually unflagging obligation' to exercise the jurisdiction that we have been given." *Continental Airlines*, 91 F.3d at 568 (Alito, J., dissenting) (quoting *Colorado River*, 424 U.S. at 817). Although equitable-mootness is imposed by judges on ourselves, it is no less an affront to the separation of powers than a doctrine usurping jurisdiction that Congress never provided. *See Cohens*, 19 U.S. (6 Wheat.) at 404 ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution").

Similar concerns with decisions not to decide cases properly within a court's jurisdiction have led the Supreme Court to cast doubt on other "prudential" doctrines that are not based in the text of any statute or in Article III principles. For example, the Supreme Court recently described a request "that we should decline to adjudicate [a] claim on [standing] grounds that are 'prudential,' rather than constitutional" as "in some tension with our recent reaffirmation of the principle that 'a federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging.'" *Lexmark*, 134 S. Ct. at 1386 (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013)); *see also Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014) (rejecting a "prudential ripeness" argument as also "in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging" (quoting *Lexmark*, 134 S. Ct. at 1386)). "Just as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, it cannot limit a cause of action that Congress has created merely because 'prudence' dictates." *Lexmark*, 134 S. Ct. at 1388 (internal citation omitted). This trend "has placed the continuing vitality of the prudential aspects of standing and ripeness . . . in doubt." *Kentucky v. United States ex rel. Hagel*, 759 F.3d 588, 596 n.3 (6th Cir. 2014). In my view, this suggests that our equitable-mootness doctrine is an overreach.

Nor am I convinced by the City's argument that equitable mootness can be based in the same equitable powers that underlie the Supreme Court's abstention doctrines. Those doctrines are an exception to our "virtually unflagging obligation" to hear cases within our jurisdiction, *Quackenbush*, 517 U.S. at 716 (quoting *Colorado River*, 424 U.S. at 821), and they arise "in otherwise 'exceptional circumstances,' where denying a *federal* forum would clearly serve an important countervailing interest," *id.* (quoting *Colorado River*, 424 U.S. at 813) (emphasis added). It is within that federalism-protecting frame that the Supreme Court has discussed the authority of a federal court "to decline to exercise its jurisdiction when it 'is asked to employ its historic powers as a court of equity.'" *Id.* at 717 (quoting *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 120 (1981) (Brennan, J., concurring)). The abstention doctrines that grow out of this bear little resemblance to equitable mootness. For one, they are generally based at least in part on federalism concerns that are not present in equitable-mootness cases.

Additionally, they are *abstention* doctrines, not *abdication* doctrines. *See One2One*, 805 F.3d at 440 (Krause, J., concurring). The result of equitable mootness is that *no court* will hear the issue; abstention doctrines counsel in favor of deferring to a different forum. "[W]here there is no other forum and no later exercise of jurisdiction . . . relinquishing jurisdiction is not abstention; it's abdication." *Id.*

A final concern with equitable mootness is that it undermines the delicate constitutional balance on which bankruptcy adjudication is based. *See id.* at 444–46 (Krause, J., concurring). Bankruptcy courts are given the authority to "hear and determine all cases under title 11 and all core proceedings arising under title 11 . . . subject to review under section 158," 28 U.S.C. § 157(b)(1), which provides that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees" of bankruptcy courts, 28 U.S.C. § 158(a)(1), and that "[t]he courts of appeals shall have jurisdiction of appeals from all final decisions" of district courts in such appeals, 28 U.S.C. § 158(d)(1). This right to review in Article III courts remains key to the Supreme Court's decisions setting forth the limitations on a bankruptcy court's authority to decide cases. *See, e.g.*, *Wellness*, 135 S. Ct. at 1944 ("allowing Article I adjudicators to decide claims submitted to them by consent does not offend the separation of powers *so long as Article III courts retain supervisory authority over the process*" (emphasis added)). This flows from the separation-of-powers concerns that the bankruptcy-court system raises: "Even if a case is tried in the first instance in a non-article III tribunal, a separation-of-powers interest remains in ensuring appellate review by an article III court." Richard H. Fallon, Jr., *Of Legislative Courts, Administrative Agencies, and Article III*, 101 Harv. L. Rev. 915, 939 (1988). The problem with equitable mootness is not only that it cuts off entirely the right to appeal to an Article III court, but that "it effectively delegates the power to prevent that review to the very non-Article III tribunal whose decision is at issue" because "bankruptcy courts control nearly all of the variables" that are considered in assessing whether an appeal is equitably moot. *One2One*, 805 F.3d at 445 (Krause, J., concurring); *see also Nordhoff*, 258 F.3d at 192 (Alito, J., concurring in the judgment) ("[E]quitable mootness . . . can easily be used as a weapon to prevent any appellate review of bankruptcy court orders

confirming reorganization plans. It thus places far too much power in the hands of bankruptcy judges.").

## C. No Legal Basis Exists for Applying Equitable Mootness to Chapter 9.

The flaws in our equitable-mootness doctrine are many. It has little basis in the text of the Bankruptcy Code, creates precisely the type of prudential limitation on our jurisdiction that the Supreme Court has criticized, and undermines the delicate constitutional balance on which the bankruptcy-court system is based. These concerns suggest that it is high time for us to review the doctrine's basis as a full court sitting en banc.[2] For now, however, our panel is bound by our precedent applying the doctrine of equitable mootness. But in this case, we are asked to extend that questionable doctrine to a new area. Although we must extend even a bad precedent when no principled basis exists for distinguishing between the context in which it arose and that to which we are asked to extend it, *see, e.g.*, *United States v. Honeycutt*, 816 F.3d 362, 381–83 (6th Cir. 2016) (Moore, J., concurring in the judgment) (critiquing precedent regarding the interpretation of a federal forfeiture statute, but agreeing that it must be applied to "a statute involving identical language"), *petition for cert. filed*, 2016 WL 4088374 (U.S. July 29, 2016) (No. 16-142), I do not believe that this case presents such a situation. Our precedent adopting the doctrine of equitable mootness in Chapter 11 cases gives little hint of the legal basis for its adoption, but what can be discerned from those opinions suggests that the doctrine grows out of statutory provisions that do not apply to Chapter 9 of the Bankruptcy Code.

The Majority reads our precedent extremely broadly to demand the application of equitable mootness in any case involving strong reliance interests. I cannot discern the basis for

---

[2]I also note that the policy justifications for equitable mootness are not necessarily as strong as courts have presumed. The idea is that the reliance interests generated by a bankruptcy court's confirmation of a reorganization plan can be so strong that it becomes inequitable to upset them. Yet, in any other context, we would not hesitate to add that a party should not rely blindly on the decision of a trial court when timely appellate proceedings are commenced. Those relying on a bankruptcy court's decision should be aware of the risk that an appeal will disrupt it. Nonetheless, equitable mootness "rests on the notion that, once a plan has taken effect, its beneficiaries—even parties in the bankruptcy court who pushed for confirmation over the legal objections of dissenting creditors—are entitled to rely on the challenged plan's not changing, whether or not it was infected by legal error." Pet'n for Writ of Certiorari, *Aurelius Capital Mgmt., LP v. Tribune Media Co.*, No. 15-891, 2016 WL 159570, at *2 (Jan. 11, 2016), *cert. denied*, 136 S. Ct. 1459 (2016). If ever we reconsider the equitable-mootness doctrine, the *reasonableness* of the reliance interests the doctrine seeks to protect should be explored in much greater depth.

such a broad rule from our precedent, which applied cases from other circuits without adding analysis. I also fear that the Majority's approach will be impossible to cabin because *all* final decisions of district courts create reliance interests and *all* appeals have the potential to upset those interests. The Majority's rationale would appear to create a new requirement for appellate review in every case: That the appeal not risk upsetting too strong a reliance interest. Where this would end I do not know, but cases have already begun to illustrate the breadth of the doctrinal creep that we could face. The Seventh Circuit has applied equitable mootness to an appeal seeking to challenge a forfeiture settlement arising out of an individual's conviction for a complex RICO violation, *United States v. Segal*, 432 F.3d 767, 773–74 (7th Cir. 2005), and the Third Circuit was even asked to apply the doctrine as a basis for cutting off appeals in complex class actions, *In re Diet Drugs*, 582 F.3d 524, 552 n.55 (3d Cir. 2009). Absent a specific statutory grounding, the Majority's expansion of our equitable-mootness doctrine will create a new pseudo-jurisdictional rule that appears to be boundless.

The best reading of our precedent must look to the precise rationale of the cases that our court cited to support our adoption of equitable mootness. Our equitable-mootness cases all trace back to *City of Covington*, *see supra* at 6–7, which did not explain the legal basis for equitable mootness, except to cite the Seventh Circuit's decision in *UNR*. *See* 71 F.3d at 1225. The statutory-gap-filling theory used by the Seventh Circuit in *UNR* to justify the adoption of equitable mootness—hardly viable in the context of the Chapter 11 proceedings in which it arose, *see supra* at 8—is utterly inapplicable to Chapter 9. As best articulated, equitable mootness has been based on three statutory provisions, two of which—11 U.S.C. §§ 363(m) and 1127(b)—do not apply to Chapter 9 cases. *See* 11 U.S.C. § 901(a) (listing provisions of other Chapters of the Bankruptcy Code that "apply in a case under" Chapter 9). Those two provisions were the entire cloth from which the Seventh Circuit stitched a policy in favor of venerating reliance interests. *See UNR*, 20 F.3d at 769. The third provision that is cited—by other courts, but not ours or the Seventh Circuit in *UNR*—is 11 U.S.C. § 364(e), which limits appeals from orders authorizing a bankruptcy trustee "to obtain credit or incur debt" or "grant[ing] . . . a priority or a lien." Although that provision applies to Chapter 9 cases, 11 U.S.C. § 901(a), it is an incredibly thin reed on which to base a doctrine that would cut off appellate rights related to

orders confirming reorganization plans, without regard to whether they relate to orders that are statutorily moot under § 364(e). Indeed, § 364(e), "[b]y [its] terms . . . do[es] not prevent an appellate court from *hearing* an appeal, or even from granting a particular remedy; [it] simply prevent[s] the appellate court's remedy from affecting certain transactions." *One2One*, 805 F.3d at 443 (Krause, J., concurring). The statutory basis for applying equitable mootness to Chapter 11 cases is therefore not present at all in Chapter 9 cases, so our precedent does not bind us to extend equitable mootness to Chapter 9.

Nor is there any other compelling reason to apply the doctrine of equitable mootness to Chapter 9 appeals. As I have discussed, equitable mootness is highly questionable, even under Chapter 11. And, of the three decisions applying the doctrine of equitable mootness to Chapter 9 appeals, two provided no analysis of why the doctrine applied in Chapter 9. *See In re City of Vallejo*, 551 F. App'x 339 (9th Cir. 2013); *Alexander v. Barnwell Cty. Hosp.*, 498 B.R. 550 (D.S.C. 2013). The Bankruptcy Appellate Panel of the Ninth Circuit recently held that the doctrine applied to Chapter 9 solely because of the finality and reliance concerns that a city's residents had in a case dealing with their city's bankruptcy, *In re City of Stockton*, 542 B.R. 261, 274 (B.A.P. 9th Cir. 2015), and the district court in this case similarly held that the doctrine applied to Chapter 9 because the relevant reliance interests were similar to those that arise in Chapter 11, *see* R. 52 (Sept. 29, 2015 Op. at 8–11) (Page ID #65167–65170). This focus on reliance interests suffers from the same defect as the Majority's focus on the same. The lack of any other justification for applying equitable mootness to Chapter 9 cases, combined with my deep skepticism about the doctrine's wisdom, convinces me that there is no reason to extend to the doctrine to Chapter 9 of the Bankruptcy Code. I would therefore reverse the district court's conclusion that the appeals were equitably moot and remand for further proceedings.

## II.

In deciding not to decide this case, the Majority decides much. The Majority extends our ill-reasoned equitable-mootness doctrine to a new context, imposing an unsupported and damaging limit on our appellate review that will be impossible to cabin in a principled way. There is no textual support for this limitation, even accepting the minimal textual support for

applying equitable mootness to Chapter 11 cases. Instead, the Majority expands a species of prudential mootness, the precise kind of pseudo-jurisdictional doctrine that the Supreme Court has suggested conflicts with our "virtually unflagging obligation . . . to exercise the jurisdiction given [us]." *Quackenbush*, 517 U.S. at 716 (first alteration in original) (quoting *Colorado River*, 424 U.S. at 821). And in doing so, the Majority further upends the delicate constitutional balance on which our bankruptcy-adjudication system is based by ensuring that those who seek to appeal the approval of a bankruptcy plan may never have their claims heard by an Article III judge. The Majority makes these missteps all in the name of protecting reliance interests. I have my doubts about the reasonableness of any reliance on a reorganization plan that is known to be subject to significant challenge on appeal, but even if the Majority's concern about reliance interests is fully valid, it is not our job to write a law to protect those interests. "Questions may occur which we would gladly avoid, but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty." *Cohens*, 19 U.S. (6 Wheat.) at 404. The Majority failing to do so, I respectfully dissent.